IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

IN RE: ROBERT AND JULIA GRIFFIN, Debtors                    No. 2:10-bk-73471
                                                                                Chapter 11

ORDER AND OPINION GRANTING TRUSTEE'S MOTION TO ENFORCE
SETTLEMENT BUT DENYING RELIEF REQUESTED

On April 3, 2013, Richard L. Cox, the chapter 11 trustee appointed in this case, filed his
*Motion to Enforce Settlement Agreement and Compel Arvest Bank's Delivery of
Documents* [Motion to Enforce], seeking the enforcement of a settlement agreement
between Arvest Bank [Arvest]; Robert and Julia Griffin [Griffin]; and four of Griffin's
companies: Stinson, Inc. [Stinson], The Plantation, LLC [Plantation], Sabram Estates
West, LLC [Sabram Estates West], and Silver Leaf East, LLC [Silver Leaf East]
[collectively with Griffin referenced as the debtors ].[1]  On May 10, 2013, Arvest filed a
response that incorporated by reference an objection that it had filed previously in
response to the debtors' January 27, 2012 motion to enforce.  Both the trustee and Arvest
requested attorneys fees and costs in relation to the Motion to Enforce.  The Court held a
hearing on the Motion to Enforce that began on November 6, 2013, and concluded on
December 9, 2013.  On both dates, Thomas S. Streetman appeared on behalf of the
trustee, and Jackie L. Hill, Jr. and Ruston C. Welch appeared on behalf of Arvest.  At the
conclusion of the hearing on December 9, 2013, the Court instructed the parties to file
post-trial briefs in lieu of closing arguments and took the matter under advisement.  For
the reasons stated below, the Court grants the trustee's Motion to Enforce the parties'
settlement agreement, but denies the relief requested by the trustee.

---

[1] Although "Griffin" in most contexts means Robert Griffin, "Griffin" may, at
times, encompass the other debtors to the extent that Robert Griffin owns those entities
and controlled their performance under the settlement agreement.

**Background**

On July 6, 2010, Griffin filed this chapter 11 bankruptcy case. Approximately two months later (on various dates in September 2010), Plantation, Stinson, Sabram Estates West, and Silver Leaf East [the LLC debtors] (along with ten other companies also owned by Griffin), filed chapter 11 bankruptcy cases. Prior to the debtors filing their respective chapter 11 cases, Arvest had obtained state court judgments against Plantation, Stinson, and Sabram Estates West. On October 29, 2010, the Court modified the automatic stay in the LLC debtors' cases to require the LLC debtors to make monthly payments to Arvest by the 7th day of each month [the For Cause payments] because the debtors had frustrated Arvest's collection efforts.[2] The Court ordered the For Cause payments to commence on December 7, 2010, and continue until plans of reorganization were confirmed. The Court specified that if the debtors failed to timely make any of the For Cause payments, Arvest would be entitled to again file motions for relief that, barring unusual circumstances, the Court would grant.

None of the debtors ever filed plans of reorganization. On August 4, 2011, Griffin, the LLC debtors, and Arvest entered into a two-page settlement agreement [Settlement Agreement].[3] The Settlement Agreement, reproduced in its entirety below with the exception of the parties' signatures, provided as follows (emphasis added by the Court):

---

[2] The Court verbally ordered the LLC debtors to make the For Cause payments on October 29, 2010; the Court's October 29 order was subsequently memorialized and entered on the docket on December 14, 2010.

[3] The Court also refers to the Settlement Agreement as the "August 4, 2011 Settlement Agreement" when it is necessary to differentiate between the initial two-page agreement signed by the parties on August 4, 2011, and the parties' full settlement agreement as embodied by the August 4, 2011 Settlement Agreement and the terms contained in a subsequent motion and agreed order.

2

## GRIFFIN SETTLEMENT AGREEMENT

1. **Transfer of Properties.** Plantation LLC, Sabram Estates West, LLC, and Silver Leaf East LLC (the "LLC Debtors") will convey their respective mortgaged properties (the "Mortgaged Properties") to Arvest by Warranty Deed in consideration of the value determined by the Bankruptcy Court for purposes of interest payments.

2. **Stinson Property.** Robert and Julia Griffin ("Griffin") shall cause Stinson Inc. to execute and deliver a Warranty Deed conveying the following described "Stinson Property" free and clear of all liens or encumbrances to Arvest:

    2.1 Ninety (90) acres at 1420 W. Center Street, Greenwood, AR, Parcel No. 60001-0000-03325-00;

    2.2 Eighty (80) acres at 1420 W. Center Street, Greenwood, AR, Parcel No. 60001-0000-0453-00; and,

    2.3 Thirty (30) acres at 1717 W. Main Street, Greenwood, AR, Parcel No. 60001-0000-04517-00, less the approximately five (5) acres homestead tract.

3. **Fawn Trail Property**. The Fawn Trail Property shall consist of the real and personal property and all improvements located at 4250 Fawn Trail, Greenwood, AR and identified as parcel 64271-0010-00000-00 and as Lot 10 in Deer Wood Estates III to the city of Greenwood, Sebastian County, Arkansas, consisting of three (3) acres more or less. Griffin shall cause East Hills Construction Inc. to execute and delivery a Warranty Deed in favor of Arvest into escrow, *subject to timely and full performanc*e of the terms hereof, conveying the Fawn Trail Property free and clear of all liens or encumbrances, to be delivered to Arvest only if Griffin or LLC debtors fail to *timely perform* this agreement. If the terms of this agreement are *fully performed* by Griffin and the LLC debtors, then the Fawn Trail Warranty Deed shall be returned to Griffin. If Griffin and the LLC Debtors *fully perform* all terms herein except the payment of the $270,000, then Arvest will accept the Warranty Deed conveying title to the Fawn Trail Property free and clear of liens at the time of delivery and recording of the deed in satisfaction of the $270,000 payment and this Agreement shall be deemed completed and fulfilled for purposes of paragraph 7 hereof.

4. **Relief from Automatic Stay- LLCs**. The automatic stay in each of the LLC Debtor's Bankruptcy Cases shall be terminated as to the Mortgaged Properties and Stinson Property, the Mortgaged Properties and Stinson Property shall be abandoned and quit claim deeds shall be

3

executed by the LLC Debtors in favor of Arvest.

5. **Relief from Automatic Stay- Griffin**.  The automatic stay in the Griffin Bankruptcy Case shall be conditionally terminated to provide that *if Griffin does not timely perform* according to this agreement and satisfy any payments required herein, Arvest shall be entitled to immediately present confessed judgments for entry in the State Court Actions liquidating Arvest's claims against Griffin therein in the full amount of the Indebtedness, subject to credit of the amounts given herein as consideration and or in credit bids for foreclosure of the respective Mortgaged Properties.

6. **Cash Payments**.  Griffin shall pay to Arvest, in collected and immediately available funds, the following amounts:
  6.1 Within twenty [sic] (30) days of Bankruptcy Court Approval, Four Hundred Fifty Thousand Dollars ($450,000.00); and,
  6.2 Within ninety (90) days of the Bankruptcy Court Approval, an additional Two Hundred Seventy Thousand Dollars ($270,000.00).

7. **Satisfaction of Arvest's Claims**.  If Griffin and the LLC Debtors (collectively, "Debtors") *fully and timely perform* all terms of this Agreement, Arvest will release its proofs of claim in the Bankruptcy Cases and deem all of the Debtors' Indebtedness satisfied.[4]  If the Debtors *fail to fully and timely* perform all terms of this Agreement, Arvest's proofs of claims in the Bankruptcy Cases and the Indebtedness shall remain unsatisfied to the extent not credited or credit bid for the Mortgaged Properties or paid in cash.

8. **Debtor Releases**.  Effective on Bankruptcy Court Approval, each of the Debtors, on behalf of themselves and any and all other entities owned or controlled by any of the Debtors, shall unconditionally release Arvest and its subsidiaries, affiliates, directors, officers, shareholders, employees, agents, attorneys, representatives and their respective heirs, legal representatives, executors, administrators, successors and assigns (the "Released Parties") from any and all claims of any kind or character, known or unknown, now existing or hereafter to accrue against the Released Parties.

---

[4] Arvest filed proofs of claim totaling $8,044,368.59 in Robert and Julia Griffin's case, based upon the Griffins' guarantees of the loans obtained by the LLC debtors.

4

9. **Bankruptcy Court Approval**.  This Agreement shall be binding on all parties hereto, subject only to the approval of this Agreement by the Bankruptcy Court pursuant to a Compromise Motion, in form acceptable to all parties hereto.  The terms hereof shall be further incorporated into more comprehensive settlement documentation acceptable to the parties, but containing not less than the foregoing material terms.  Provided, in the event the Bankruptcy Court does not enter a final non-appealable order approving the Compromise Motion within sixty (60) days of the filing of the Compromise Motion, this Agreement shall become null and void.

10. **Continued Action**.  Until such time as the Compromise Motion has been approved, and the Debtors have *fully performed* the terms hereof, all parties shall be entitled to pursue any and all remedies available to them, including pursuit by Arvest of a creditor's plan of reorganization of some or all of the Debtors and other entities, as alternatives to approval of the Compromise Motion and\or the Debtors' performance hereof.

11. **Expiration of Offer**.  This proposal will expire at 5:00 PM on August 4, 2011, if not accepted and returned to Arvest with all of the signatures on behalf of the Debtors.

12. **Counterpart Execution**.  This Agreement may be executed in multiple counterparts, all constituting a single Agreement.

Arvest Ex. 25 at R. 823-26.[5]  On August 16, 2011, Arvest filed *Second Motion[s] for Relief from the Automatic Stay and for Abandonment of Real Property and Brief[s] in Support* [Second Motions for Relief] in each of the LLC debtors' cases because the LLC debtors had failed to make their August 7, 2011 For Cause payment as ordered by the Court on October 29, 2010.  Also on August 16, 2011, Arvest filed a motion seeking the Court's approval of the settlement between Arvest and the debtors [Motion to Approve Compromise], thereby effectuating  paragraph 9 of the Settlement Agreement (stating that the agreement was binding on all parties subject to Court approval "pursuant to a

---

[5]  Although the parties introduced many of the same documents at the hearing on the Motion to Enforce, the Court cites to Arvest's exhibits for the clarity provided by the sequentially numbered pages.  Hereafter, the Court will identify exhibits by reference to the specific page number in the Arvest exhibits unless otherwise indicated.  For instance, this citation becomes R. 823-26.

Compromise Motion, in form acceptable to all parties hereto").[6]  In its Motion to Approve Compromise, Arvest specified that the debtors would execute warranty deeds (rather than the quitclaim deeds that were referenced one time in the Settlement Agreement at paragraph 4), added language to relieve the debtors of responsibility for ad valorem real estate taxes, and clarified and summarized the terms of the Settlement Agreement as follows:

10.1  Upon approval, Plantation will transfer by warranty deed the Plantation Property, consisting of all real and personal property previously pledged and\or mortgaged to Arvest . . . free and clear of any and all liens, claims and encumbrances of any third parties pursuant to 11 U.S.C. §§ 363(b) and (f), excepting only for: (i) *ad valorem* real estate taxes.

10.2  Upon approval, SEW will transfer by warranty deed the SEW Property, consisting of all real and personal property previously pledged and\or mortgaged to Arvest . . . free and clear of any and all liens, claims and encumbrances of any third parties pursuant to 11 U.S.C. §§ 363(b) and (f), excepting only for: (i) *ad valorem* real estate taxes.

10.3  Upon approval, SLE will transfer by warranty deed the SLE Property, consisting of all real and personal property previously pledged and\or mortgaged to Arvest . . . free and clear of any and all liens, claims and encumbrances of any third parties pursuant to 11 U.S.C. §§ 363(b) and (f), excepting only for: (i) *ad valorem* real estate taxes.

10.4  Upon approval, Stinson will transfer by warranty deed the Stinson Property, as identified by specific tracts in the Settlement Agreement to the Designee free and clear of any and all liens, claims and encumbrances of any third parties pursuant to 11 U.S.C. §§ 363(b) and (f), excepting only for: (i) *ad valorem* real estate taxes.

10.5  Upon approval, East Hills will transfer by warranty deed the Fawn Trail Property, as identified in the Settlement Agreement, into escrow as set forth in the Settlement Agreement, to the Designee free and clear of any and all liens, claims and encumbrances of any third parties pursuant to

---

[6]  Arvest filed an Amended Motion to Approve Compromise on August 17, 2011, in order to expand the service list of the Motion to Approve Compromise to include all creditors listed in the five implicated bankruptcy cases–Griffin, Stinson, Plantation, Sabram Estates West,  [sometimes referenced as SEW or Sabram]; and Silver Leaf East [sometimes referenced as SLE].

11 U.S.C. §§ 363(b) and (f), excepting only for: (i) *ad valorem* real estate taxes.  In the event the Debtors fully perform on all other terms of the Settlement, the Fawn Trail Property will be returned to East Hills.  Failing full performance, the Fawn Trail Property will be unconditionally transferred to [Arvest].

10.6  Following approval, Griffin will cause cash payments of $450,000 and $270,000 to be made to Arvest on the timing schedule set forth in the Settlement Agreement.

10.7  Each of the Debtors will provide releases to Arvest as specified in the Settlement Agreement.

10.8  Following approval and closing of the compromise, Arvest will withdraw its Objection to Motion to Dismiss [Doc #90] filed in the Stinson case, and will withdraw its Claims in all the other cases as per the Settlement Agreement.

10.9  Various other terms and conditions of the compromise are contained in the Settlement Agreement which Arvest hereby requests be approved as part of the compromise among the parties.  To the extent of any conflict with the foregoing summary, the terms of the Settlement Agreement will control.

R. 831-35.  In addition to seeking the Court's approval of the Settlement Agreement in the Motion to Approve Compromise, Arvest moved the Court to enforce the settlement and prior orders, to modify the automatic stay, and to allow the debtors to transfer the properties specified in the Settlement Agreement to Arvest free and clear of any liens or encumbrances (excluding ad valorem tax liens) under 11 U.S.C. § 363(b) and (f).  On October 13, 2011, Welch (co-counsel with Hill for Arvest) emailed to Derrick Davidson (counsel for Griffin and former counsel for the LLC debtors) a proposed order approving the Motion to Approve Compromise for his review and comments.  R. 1071.  By separate email on the same day, Welch told Davidson,

I anticipate the [sic] we will get the compromise order done, filed and entered by tomorrow.  Then we can get the settlement closed next week.  So long as we get the closing of the settlement done before November 7, 2011, Arvest does not expect future adequate protection payments.  I anticipate this will be agreeable to you and Mr. Griffin.  If not let me

know.[7]

R. 1074.  On October 14, 2011, Davidson responded to Welch by email and stated that

> the proposed Order is acceptable with one general exception concerning
> the property descriptions attached as Exhibits.  It appears that Arvest has
> taken the original property description from the original mortgages and
> used that in the Exhibits.  In view of this, some lots have been sold, for
> example, in The Plantation and Silver Leaf  East subdivisions that were
> released by the Debtors' agreements with Arvest.  Such lots need to be
> excluded from the property descriptions as what is being conveyed.  Based
> on the time constraints to get the Order entered, there is no way to get a
> title company to modify the legal description to take this into account.
> Also, the legal description on the Stinson property out of which the 5 acre
> homestead tract is to be excluded is not referenced in the legal description
> for that property.  I don't know the best way to address this other than to
> agree that the legal description [sic] in the proposed Order are incorrect,
> and further agree to amend the Order so they will correctly reflect what
> [is] being conveyed.

R. 1080.  The same afternoon, Welch responded to Davidson's concerns through two

emails, the first sent approximately fifteen minutes after Davidson expressed the above

reservations about the proposed order.  Welch's first email to Davidson, stated, in part:

> The Plantation, SLE, and Sabram legal descriptions all have LESS AND
> EXCEPT for the lots and land sold . . . .  [Arvest knows] the Debtor's [sic]
> can only convey what it has, after selling with Arvest's permission.

R. 1079.  Welch's second email to Davidson, sent approximately one hour after his first,

stated:

> I added the 5 acre tract carve out.   I also re-verified the SLE lot sales and
> found 4 more that were removed from the property to be conveyed.  Based
> on your email, my prior response and these additions, I believe the Order
> is ready to submit.  Please send me your approval.

R. 1078.  Arvest subsequently submitted to the Court a proposed order approving the

Motion to Approve Compromise that was signed by counsel for all parties to the

Settlement Agreement.  On October 17, 2011, the Court entered an order approving the

---

[7] The parties use "adequate protection payments," "frustration payments," and
"for cause" payments interchangeably to refer to the monthly payments ordered by the
Court on October 29, 2010.

Motion to Approve Compromise [the Agreed Order Approving Compromise].  R. 1046.
The Agreed Order Approving Compromise granted the Motion to Approve Compromise
"in all respects," and approved the Settlement Agreement "it its entirety," thereby
incorporating into the parties' settlement the terms contained in both the August 4, 2011
Settlement Agreement and the Motion to Approve Compromise.

The Agreed Order Approving Compromise "authorized and directed" Plantation, Silver
Leaf East, Sabram Estates West, and Stinson to execute and deliver warranty deeds
conveying property specified in the Settlement Agreement to Arvest [the subject
properties].  The Agreed Order Approving Compromise also "authorized and directed"
Griffin to cause East Hills (a non-debtor company owned by Griffin) to execute a
warranty deed conveying the Fawn Trail property to Arvest and deliver the deed into
escrow as dictated by the Settlement Agreement.  The Agreed Order Approving
Compromise specified that:

> In the event the Debtors *fully* perform on all other terms of the Settlement,
> the deed to the Fawn Trail Property will be returned to East Hills unfiled.
> *Failing full performance*, the deed will be delivered to [Arvest] and Fawn
> Trail Property will be unconditionally transferred to [Arvest].

R. 1046 (emphasis added).  The Agreed Order Approving Compromise stated that the
transfers of real and personal property authorized by the order "shall be free and clear of
any and all liens, claims and encumbrances of any third parties pursuant to 11 U.S.C.
§§ 363(b) and (f)."   The Agreed Order Approving Compromise provided:

> The automatic stay in each of the above listed cases shall be further
> conditionally terminated, annulled, lifted and amended in favor of Arvest
> Bank to exercise all remedies and as set forth in the Settlement Agreement
> if the Debtors do not *timely and fully* consummate the Settlement
> Agreement.

R. 1049-50 (emphasis added).  On October 21, 2011, Welch emailed Davidson that:

> Mr. Griffin was supposed to be getting the legal description of the 5 acre
> homestead tract.  We have prepared the deeds and need the description so
> the legal can be finalized.  What day next week would you and Mr. Griffin
> be available to close the settlement?

9

R. 1091.  On October 24, 2011, Welch again emailed Davidson requesting a date for
closing and the legal description for the 5 acre carve out promised by Griffin.  On
October 25, 2011, Davidson responded that he had not yet received the information from
Griffin.  On October 31, 2011, Welch sent Davidson a detailed letter by email, attaching
the five warranty deeds, the releases, and the consent judgments that Arvest had prepared
to close the settlement agreement.  R. 1096.  The October 31 letter stated, in part:

> The Settlement Agreement requires the properties to be transferred free
> and clear of all liens and encumbrances, except real estate taxes and
> Arvest Mortgages.  Title commitments obtained following the Court's
> approval reveal that numerous weed and mowing liens have been placed
> on the Silver Leaf East, LLC property.[8]  A copy of the title commitment is
> attached herewith.  I have discussed with the title company and [am]
> advised that each weed and mowing lien is $330, plus costs and interest.
> Thus, in order to clear the 29 weed and mowing liens and deliver title as
> required by the Settlement Agreement, the Debtors will need to pay at
> closing the sum of $11,254.45 to clear the weed and mowing liens.  If this
> amount is not paid on or before November 15, 2011, additional interest
> will be due and payable.
> . . . .
>
> Finally, the homestead parcel that Mr. Griffin said had a house built on it
> has already been separated from the subject 30 acre parcel and is only one
> (1) acre, not five (5) acres.  As the homestead parcel is already excluded
> from the 30 acre parcel, please let me know why the additional five (5)
> acres is being excluded.  Anticipating an explanation, and to further avoid
> any conflicts, we have prepared the Warranty Deed with the provided
> legal description for the twenty-five (25) acre tract only.
>
> Please have Mr. and Mrs. Griffin sign and deliver each of the documents,
> and before a notary, where indicated and deliver all documents to Mr.
> William Staed at his branch in Fort Smith **before noon, Wednesday,
> November 2, 2011**.

---

[8]  11 Okl. St. § 22-111 authorizes an Oklahoma municipality to remove trash and
weeds from property within its municipal limits at the property owner's expense.  If the
property owner does not pay the amount billed by the municipality for mowing the
property, a lien "superior to all other titles and liens against the property" attaches to the
property.  11 Okl. St. § 22-111(6).

R. 1096-97.[9] On November 3, 2011, Welch again emailed Davidson, summarizing his letter of October 31, 2011, and stating, in part, that:

> Neither Arvest nor I have heard any response to the letter or any of the documents from either Mr. Griffin or you. Thus, I presume the deeds, judgments, and release are acceptable. I am sure you understand that it took some time to have title reports updated on the properties and to confirm no liens or encumbrances and the final legal descriptions. The Settlement was entered into on August 4, 2011 and approved by the Court at a hearing on October 12, 2011 and there is no other reason for this delay. Arvest Bank has been more than accommodating in agreeing to a credit of the For Cause payments towards the cash payments and going forward with the entry of the Court Order even though it was not entered within 60 days. If you recall, you called me late in the day on Friday, October 14, 2011 wanting to make sure that the deal would go forward even if the Court did not get the Order entered that day.
>
> The Order authorizes and directs the Griffins and the other Debtors to execute and deliver the deeds and documents pursuant to the Settlement Agreement. If your client is not willing to timely perform under the Settlement Agreement, now 16 days after the entry of the Order, then please advise me so. Your and Mr. Griffin's complete lack of communication or response to completing the closing is disappointing.
>
> If you have any comments, questions or requested changes to the documents, contact me before noon, Friday, November 4, 2011. If I do not hear from you, we will consider the documents in final form. The documents were to have been signed, notarized where applicable and delivered to Arvest Bank by Wednesday, November 2, 2011. They were not. If the documents are not properly executed and delivered by 3:00 p.m. on Monday, November 7, 2011, then Arvest will consider Mr. Griffin in breach of the Settlement Agreement and will prepare, file and prosecute to hearing motions to compel Mr. Griffin and the Debtors performance.

R. 1100. Late in the day on November 3, Davidson emailed Welch to convey that he had been out of town and to assure Welch that he would get to the Griffin matter the next day.

R. 1104. Welch responded within fifteen minutes, stating:

> Thanks, Derrick, I hope you were some place enjoyable and not just working. Feel free to call me if you have any questions when you are

---

[9] William "Bill" Staed is a senior vice president with Arvest who has been embroiled in negotiations and litigation with Griffin and the LLC debtors since 2010.

reviewing the documents.  Mr. Staed is happy to work with Bob to get this closed if coming to the Fort Smith location is any problem.

R. 1103.  On November 4, 2011, Davidson emailed Welch to preliminarily address his concerns that

> . . .the form of the Warranty Deeds you provided warrants there are no taxes and the agreement Mr. Staed made on the stand at the hearing was that all adequate protection payments for Aug, Sept. and Oct. were to be applied against the payment due in 30 days).  In view of this, I need Mr. Griffin's input, and due to a mix-up in my office while I was out, the settlement docs did not get forwarded to him for his review.  That said, I have talked to Mr. Griffin and sent the docs to him for review and he is supposed to be getting back to me this afternoon.  Further, if necessary, I am going to be working with him tomorrow to address any issues we don't get resolved today (e.g. the legal description for the 5 acre homestead to be excluded from one of the tracts to be deeded).

R. 1109.  On November 7, 2011, Welch emailed Davidson that he would

> revise the Warranty Deeds to except outstanding real property as valorem [sic] taxes.  The 5 acre tract legal description is the description Mr. Griffin provided to Mr. Staed.  As stated in my transmittal letter, despite the fact that the separated tract with the house built on it is only one acre and not included in the 30 acre tract owned by Stinson, Arvest has moved forward by using only the 25 acre description.  Equally, there were different discussions as to the application of the For Cause payments towards the $450,000 or $270,000 amount and Arvest has proposed to split the application equally to the two payments.  Moreover, another For Cause payment was delivered to Arvest on Friday in the amount of $14,289.28.  Again, in an effort to complete this matter without unnecessary fees and expenses of fighting, Arvest will agree to apply this last For Cause payment entirely against the $450,000 payment due on November 16, 2011 **IF the closing of the execution and delivery of deeds, judgments, release and amount for Weed liens are completed no later than Wednesday, November 9, 2011 at noon.**

R. 1108.  The same day, Davidson responded that he and Griffin continued to work on a more detailed response to Arvest's proposed settlement documents.  R. 1107.  On November 8, 2011, Welch emailed Davidson, stating:

> Other than the request for making the warranty in the deeds subject to ad valorem taxes, I have not received anything from you regarding the

documentation of the settlement closing. I have the deeds revised and am waiting on further comments or issues to complete the documents. Please advise me of the status of any comments or if the remaining documents are satisfactory. Upon confirmation of the documents, I will send the revised deeds for execution. I understand that Mr. Griffin has attempted to contact Mr. Staed. There is nothing further for the parties to discuss in this matter and we need to complete the documentation, execute and deliver the documents. We are waiting on you.

R. 1114. The next day, on November 9, 2011, Davidson emailed Welch and Hill with a litany of perceived issues with the closing documents. R. 1117-20. Welch responded on November 14, 2011, first restating and then addressing each issue raised by Davidson, as follows, in relevant part:

- [Davidson's Issue] 5. The next issue arises concerning the form of the deed conveyances. In paragraph one (1) of the Settlement Agreement contemplates a transfer of the properties by "Warranty Deed in consideration of the value determined by the Bankruptcy Court for purposes of interest payment", while paragraph four (4) of the Settlement Agreement provides "the Mortgaged Properties and Stinson Property shall be abandoned and quit claim deeds shall be executed by the LLC Debtors in favor of Arvest." These provisions are clearly in conflict with regard to whether the deeds to be given are to be "warranty deeds" or "quitclaim deeds." Against this back-drop, paragraph nine (9) of the Settlement Agreement provides that "the terms hereof shall be further incorporated into more comprehensive settlement documentation acceptable to the parties, but containing not less than the foregoing material terms." In view of this, Mr. Griffin has not had a title company verify the legal descriptions set forth in the warranty deeds you sent, and, in any event, understands that his obligation was to convey the subject properties by quitclaim deed based on his negotiations with Mr. Staed and paragraph (4) of the Settlement Agreement.

- [Arvest's] Response to No. 5: We acknowledge paragraph 1 and 4 provide different deed types. Paragraph 1 provides for warranty deeds and warranty deeds will be required. In such circumstance, Arvest would waive any duplicate Quit Claim Deed. If Mr. Griffin wants to execute Quit Claim Deeds, we will prepare those in addition to the Warranty Deeds.

13

The form of the deed is different because the form is a standard form used in Arkansas versus Oklahoma for the respective locations of the properties.  If you will also notice the format of the deeds are different to comply with Arkansas formatting requirements.  If adding the language from the Oklahoma deed to the Arkansas deed does not create any issues and is approved by local Arkansas counsel, we will add the language.

The language of the deed does not control Mr. Griffin's obligations to deliver title to the properties free and clear all liens and encumbrance, the Settlement Agreement does.  The deed was prepared with the requirement that SLE pay the weed liens.  Arvest will not accept the deed without the weed liens being paid, or offset against any credit for For Cause payments.  Clearly the weed liens were incurred post-petition and are administrative expenses that must be satisfied before the Court would dismiss anyway.  Moreover, the Settlement Agreement says free and clear of ALL LIENS AND ENCUMBRANCES.  It does not even exclude the ad valorem taxes.  If you want to argue the Settlement Agreement, then Mr. Griffin would be responsible for all of the real estate taxes as well as the weed liens.  As previously stated, Arvest will agree to resolve these post petition administrative expenses and take title to the property so long as the weed liens are paid prior to and as a condition to the accepting the deed.

- [Davidson's Issue] 6.  With regard to the issues identified in the preceding paragraph of this email, please make no mistake about the fact that Mr. Griffin is ready willing and able to transfer the subject properties.  However, because Mr. Griffin cannot verify the legal descriptions and Arvest has apparently done thorough title work on the subject properties as to which Mr. Griffin's companies own, Mr. Griffin and those companies stand ready to transfer those properties which Arvest has verified as belonging to the subject companies.  In view of this, those deeds need to be quitclaim deeds . . . with the proviso that the Fawn Trail Property deed shall be held in escrow subject to whether the Settlement Agreement is fully performed by payment of the $270,000 in 90 days, and, otherwise that property will be transferred to Arvest in complete satisfaction of his obligation for that $270,000 under the Settlement Agreement.  Because certain lots and tracts of the subject subdivisions have been transferred through the years, Mr. Griffin simply cannot warrant good title to the subject properties without having to get extensive title work and insurance to verify what remains that he would be warranting title to.  This seems

14

needless because Arvest has already done that work and should be able to take comfort from that title work and the title insurance I am sure it will obtain in connection with taking title to that property.

- [Arvest's] Response to No. 6: Warranty Deeds are required. We are not renegotiating the Settlement. Paragraph 1 requires Warranty Deeds. As to the Stinson property and the 30 acres less the 5 acre tract, we have used Mr. Griffin's legal description. If Mr. Griffin needed title work then he should have already gotten it or get it now.

- [Davidson's Issue] 7. As for applying the Court ordered adequate protection payments, Mr. Staed testified on the stand and further confirmed as we were leaving the hearing on Arvest's second Motion for Relief from Stay that he would agree to credit the adequate protection payments made for August, September, October, and now November toward the $450,000 payment due in 30 days under the Settlement Agreement. Arvest will need to honor that agreement.

- [Arvest's] Response to No. 7: . . .The Debtors have not performed. As the Court recognized in his ruling, which I have the audio transcript, Arvest was not required to give credit of the For Cause payments to the amounts under the Settlement Agreement. To resolve this matter and delivery of all documents under the settlement, Arvest will agree to credit all of the For Cause payments to the first Settlement payment of the $450,000, if and only if on or before close of business on November 16, 2011: (1) all documents are fully executed and delivered in form acceptable to Arvest; and (2) the weed liens on the Silver Leaf East property are paid in full, including any additional interest that may accrue on or before November 16, 2011.

- [Davidson's Issue] 8. Based on the foregoing considerations, Mr. and Mrs. Griffin, Mr. and Mrs. Randy Berg, and the subject companies will need a release agreement spelling out precisely what will be required of them to satisfy their obligations under the Settlement Agreement. Rather than draft and send that to you now with the foregoing matters outstanding, I propose that we work those matters, and upon resolution of the same, reduce the terms of that release agreement to writing.

- [Arvest's] Response to No. 8: The Settlement Agreement requires no such release agreement. Although you have already been provided express instructions on what is required, subject now to

15

the additions herein, below are the requirements again.  If the Debtors and Mr. Griffin fully, completely and timely perform, including delivery of all documents no later than November 16, 2011, then Arvest will file releases of its proofs of claim as set forth in the Settlement Agreement.

•  [Davidson's Issue] 9.  As to the Fawn Trail Property to be conveyed, we need to address in the documentation the prospect that Mr. Griffin will be unable to perform all terms of the Settlement Agreement.  As you know, the failure to, for example, to pay the $450,000 (less credit for the adequate protection payments) by November 16, 2011 would trigger a default.  In that event, Arvest would be entitled under the Settlement Agreement to file [judgments] in the State Court actions and the unperformed obligations based on the remaining terms of the Settlement Agreement would be nullified.  Accordingly, Arvest would be entitled to pursue Mr. and Mrs. Griffin for deficiencies based on their personal guarantees of all of Arvest's loans . . . .  Because, however, the Fawn Trail Property stands only as security payment of the $270,000, then we need to provide for the contingency that a default under the Settlement Agreement prior to an obligation to make the $270,000 payment would negate Arvest's right to the Fawn Trail property.  In other words, Arvest would need to look exclusively to Mr. and Mrs. Griffin's bankruptcy estate for the satisfaction of deficiencies arising from the entry of the foreclosure decrees and would not be entitled to file the deed it will be holding in escrow on the Fawn Trail Property to satisfy the payment of such a deficiency.

•  [Arvest's] Response to No. 9: Clearly, we completely disagree with your interpretation of the Settlement Agreement and ask that you re-read Paragraph 3.  That is not what the Settlement Agreement provides.  Paragraph 3 provides that Arvest will get to record and take title to the Fawn Trail Property if ANY default occurs under the Settlement.  If the only default is the non-payment of the $270,000 then Arvest will accept the Fawn Trail Property in lieu of (1) the $270,000 and (2) triggering the Griffins' deficiencies.

R. 1125-29.  At the end of Davidson's November 9 email, he proposed the following

"alternative to trying to work through the issues related to the documentation you sent":

I.  Mr. Griffin and his affiliated companies will:
    A.  immediately pay the $450,000 to become due under the

16

Settlement (less the amount of the adequate protection payments for August, September, October, and November);

      B.  immediately pay the $270,000 to become due under the Settlement Agreement;

      C.  quitclaim deed all of the property to be transferred under the Settlement Agreement other than the Fawn Trail Property; and

      D.  execute a release of Arvest from liability related to its dealings with Mr. Griffin and his companies

IN EXCHANGE FOR:

II.  Arvest Bank:

      A.  assuming the liability for the mowing liens

      B.  withdrawing its Motion and claim for payment of attorney's fees and costs related to Arvest 2nd Motion for Relief from Stay;

      C.  returning the personal property taken from the Arvest representative that was in the container on The Plantation, LLC property;

      D.  dismissing with prejudice of [sic] of Arvest's foreclosure lawsuits against all parties related to The Plantation, LLC, Sabram Estates West, LLC, and Silver Leaf East, LLC; and

      [E.] execute a release of Mr. and Mrs. Griffin and Mr. and Mrs. Berg, and their affiliates from liability related to their dealings with Arvest.

R.  1119.  Welch responded to Davidson's "alternative" proposal at the end of his November 14 email to Davidson, stating:

> With regard to your last attempt to further re-negotiate the settlement, Arvest declines your proposal.  The parties have already negotiated a settlement, signed a written settlement and obtained Court approval of that settlement.  Arvest intends to enforce such agreement.  If the Debtors do not timely perform, then pursuant to the Settlement Agreement Mr. and Mrs. Griffin will not get the benefit of the release of the deficiencies.

R.  1130.  After addressing each of Davidson's concerns regarding the closing documents, and rejecting Davidson's alternative proposal, Welch stated that he had attached "the FINAL version of the closing documents," and reiterated that Griffin was to execute and deliver all of the documents with the first cash payment of $404,701.83 before 5:00 p.m.

on Wednesday, November 16, 2011.[10]  R. 1131.

On November 15, 2011, Davidson emailed Welch and Hill and (in inexplicable disregard for Arvest's detailed response stating that it would not agree to Davidson's alternate settlement terms) declared that:

> Mr. Griffin is just going to pay the mowing lien and the $270,000 today. This should avoid the need for [consent judgments] and the deed on the Fawn Trail property and for them to be held in escrow.  We will execute the deeds today, but you need to add in the deeds to Sabram Estates West and Silver Leaf East deeds that . . . the property [is] "subject to all encumbrances, easements, rights of way, ad valorem taxes or matters of record" and modify the language in the other deeds in the same manner. With this done, then Arvest will need to submit Orders of Dismissal with prejudice of its Foreclosure Actions against The Plantation, Silver Leaf East, Sabram Estates West and their co-defendants and withdraw its proofs of claims in those companies cases and Mr. and Mrs. Griffin's case, and any other Griffin affiliated bankruptcy case.  Then all that remains is to litigate whether your fees in connection with your 2nd Motions for Relief from Stay are reasonable.[11]

> Please confirm your agreement to handle the closing in this manner.  Time is of the essence because Mr. Griffin is going into the hospital in the morning for heart surgery.

R. 1133.  After the parties engaged in two conference calls that failed to resolve the remaining issues, Welch sent an email to Davidson stating:

> You disconnected from the conference call and we have not heard back

---

[10]  Arvest derived the amount due on November 16, 2011, by starting with the $450,000.00 payment that was due under the settlement agreement, adding $11,398.00 to clear the 2010 weed liens on the Stinson property, and subtracting $56,696.17 as credit given by Arvest for the For Cause payments.

[11]  After the parties executed the Settlement Agreement on August 4, 2011, the debtors (without seeking Court approval) stopped making the monthly For Cause payments to Arvest that the Court previously had ordered on October 29, 2010.  As a result of the missed payments, Arvest filed its Second Motions for Relief as the Court had deemed appropriate in its October 29 ruling.  The Court awarded Arvest its attorneys fees in connection with filing its Second Motions for Relief; the debtors objected to the amount of the fees.

from you.  In order to expedite matters, attached are the form of Warranty Deeds that Arvest will accept in connection with the full payment of the weed liens, $450,000 and $270,000, and delivery of the Release Agreement.  Arvest does not waive the right to receive the agreed judgments or Fawn Trail deed if the Debtors have breached the Settlement Agreement.  Let's see if we can get this deal done.  Please call if you have [any] questions.

R. 1148.  Welch sent another letter to Davidson on November 17, 2011, again explaining that Arvest had negotiated for warranty deeds under the Court-approved settlement agreement.  Welch explained to Davidson that Arvest was not interested in further litigation with Griffin in the form of foreclosure actions if the debtors had created or permitted encumbrances or other title defects on the properties to be conveyed under the settlement agreement since the debtors had filed their respective bankruptcies.  Welch stated:

> We once again tender with this letter the documents listed below, ready for closing, and request the Debtors and East Hills to execute and deliver same to Mr. Staed, in Ft. Smith by 2:30 p.m. on Friday, November 18, 2011, in order that this matter may be completed this week.  We sincerely hope that you and Mr. Griffin will reconsider your previous positions and will deliver all of the documents required under the Settlement Agreement.  Alternatively, we urge you to at least deliver the Release and Consent Judgments.
>
> However, because Arvest has not had success in completing matters with the Griffins without going back to the Bankruptcy Court at each respective turn, we will be filing a Motion to Compel at the end of the day if the closing documents are not timely delivered on Friday.  As you might expect, if we are forced to do so, we will seek our fees and costs against the Debtors and counsel.

R. 1152.  Welch ended the letter by advising Davidson that if the documents were not timely delivered on Friday, November 18, Arvest would file a motion to compel that same day.  Davidson called Welch after 2:30 p.m. on November 18 to advise that he could not reach Griffin.  Welch conveyed to Davidson that Arvest was going forward with the motion to compel, but because "Arvest wants this matter done and behind us all," Arvest was willing to provide its title reports and commitments to Davidson and would allow Griffin five business days to remove any non-excluded encumbrances on the

19

subject properties.  Arvest made its offer to provide its title reports and commitments to
Davidson contingent upon Griffin agreeing to close by noon on Tuesday, November 22,
2011, deliver a Phase I environmental affidavit, and pay Arvest $15,000.00 in settlement
of the attorneys fees that the Court had ordered the LLC debtors to pay Arvest in relation
to Arvest's Second Motions for Relief.  Welch reminded Davidson that Arvest had
offered Griffin a $56,000.00 reduction of the amount that the debtors owed under
settlement agreement (by crediting the debtors' For Cause payments against the cash
component of the settlement agreement) and reminded Davidson that Arvest "wants all
matters resolved for good."  R. 1154.

On November 18, 2011, Arvest filed its *Motion to Compel Delivery of Documents and
Enforcement of Settlement Agreement* [Arvest's motion to compel].  R. 1529.  In its
motion to compel, Arvest stated that the debtors were in default under the terms of the
settlement agreement because they had failed to execute the warranty deeds, consent
judgments, and releases required by the agreement.  Arvest asked the Court to compel the
debtors to execute and deliver to Arvest the bargained-for documents.  Arvest also argued
in its motion to compel that it was entitled to consent judgments under the settlement
agreement because the consent judgments were to be enforceable against Griffin in the
event that Griffin "[does] not fully perform ALL terms of the Settlement Agreement."
Arvest argued that "the consent judgments give Arvest further relief against Mr. Griffin if
he fails and refuses to close under the Settlement Agreement and attempts, *as he is now
doing*, to renegotiate the terms."  R. 1536 (emphasis added).

On November 23, 2011, Davidson filed the debtors' response to Arvest's motion to
compel, and urged the Court to "intervene on Debtors' behalf" to require

> (1) Arvest Bank to accept quitclaim deeds, or, in the alternative, allow
> Debtors a reasonable time for title examination so that if Debtors are
> required to execute warranty deeds they know what they are warranting,
> (2) require that any warranty deeds, as opposed to quitclaim deeds,
> required to be provided, exclude a warranty for  "encumbrances" and
> "matters of record" as in the warranty deeds originally proposed by Arvest
> Bank; (3) require Arvest Bank to accept only the money paid, the deeds,

20

> and the Agreement to Release Arvest Bank (not the Consent Judgments
> and deed to the Fawn Trail property) as the consideration to satisfy
> Debtors' obligations to Arvest under the Settlement Agreement; (4)
> require Arvest to refund the $11,254.45 that Arvest Bank required Debtors
> to pay it to remove "Mowing Liens" because the "Mowing Liens" have
> long been a matter of record, paying to remove those "Mowing Liens" was
> not part of the Settlement Agreement, and Arvest Bank agreed in the
> original deeds it proposed to take the property subject to "encumbrances"
> and "other matters of record."

R. 1573-74.  On December 7, 2011, the Court held a hearing on Arvest's motion to

compel.  During the December 7 hearing, the Court told the parties that the settlement

needed to be done based upon the parties' agreement.  R. 1655.  The Court further stated

that "I can understand the frustration of the bank, thinking they have a deal, and for

whatever reason, it gets delayed."  R. 1655.  In response to the debtors' assertion that the

consent judgments were no longer necessary, the Court stated that "the consent judgment

goes to everything" and that "it was to be provided for all matters, not just payment of

money.  It was to be for the performance of the whole agreement."  R. 1656.  In relation

to Davidson's argument that Arvest was harassing Griffin despite his recent heart

procedures and hospitalization, the Court stated that "I realize Mr. Griffin has been ill

and that's some part of the problem, but the way I see the other part of the problem is not

agreeing to the form of the documents.  And that is something not as a result of Mr.

Griffin's illness."  R. 1629.  Before taking the matter under advisement, the Court

rhetorically inquired of the parties

> isn't the fundamental question, regardless of what [Arvest] initially sent,
> look at it and see if that's what is in compliance with the agreement
> itself–what [is Griffin] required to do?  That's the issue.  Not whether
> [Arvest] sent [Griffin] something initially, as to whether or not that was
> right or wrong.  And I appreciate the background on that and I think I
> understand how that's evolved.  But the bottom line here is you've got an
> agreement; what does it say?

R. 1657.  The Court also reminded the debtors that they had made this deal with Arvest,

Arvest was now wanting the deal enforced, and that it seemed to the Court as if the

debtors were attempting to negotiate with the Court regarding what they were and were

21

not willing to do under the previously approved settlement agreement.  R. 1658.  In response to Davidson's question to the Court asking why Arvest needed consent judgments if the settlement agreement was fully performed, the Court stated that Arvest was entitled to the consent judgments because they were part of the agreement that Arvest had bargained for.  R. 1658.

In an oral ruling on December 12, 2011, the Court granted Arvest's motion to compel.  In its December 12 ruling, the Court ordered Griffin to execute and deliver to Arvest the warranty deeds, consent judgments, and releases required by the settlement agreement by noon on December 16.[12]  The Court stated that "these were all required by the Court's order of October 17th, which was approved by debtors' counsel."  R. 1668.  The Court reiterated that "these are things that really should have been executed before now and should not have required Court intervention."  R. 1668.  The Court acknowledged that the case was complicated and that some delays in closing could be attributed to Griffin's illness, but stated that "there was some other delay, as well, and I think to a large degree it was as a result of Mr. Davidson trying to tweak the documents or renegotiate aspects of the deal.  Maybe it was Mr. Griffin, as well."  R. 1669-70.

In declining to award Arvest the attorney fees associated with filing its motion to compel, the Court acknowledged Davidson's argument that he was confused by references to both warranty and quitclaim deeds in the August 4, 2011 Settlement Agreement, but pointed out that "that was really resolved by and trumped by the Court's order which required the warranty deeds."  R. 1670.  The Court stated that to the extent Griffin was concerned that he could not warrant title free of claims and encumbrances, he had already been afforded sufficient time to perform the necessary title work.  The Court then instructed Griffin to obtain any title work he deemed necessary before the December 16 deadline imposed by the Court for the debtors' delivery of documents.  The Court explained to Griffin that he

---

[12]  The Court ordered Griffin to execute the last set of warranty deeds provided to Davidson by Arvest that contained no exclusions other than ad valorem taxes.

was required to provide consent judgments to Arvest because "that was the agreement." R. 1671.  The Court also stated that the settlement agreement "appears to be a good deal for all involved.  So, it needs to be enforced and everyone needs to go on down the road." R. 1671.

Griffin delivered the warranty deeds, consent judgments, and releases to Arvest by December 16 in compliance with the Court's order.  On December 18, 2011, Davidson emailed Hill and Welch to ask when Arvest would be withdrawing its claims in the bankruptcy cases, filing satisfactions of the consent judgments, and returning the deed to the Fawn Trail property "as all terms of the settlement agreement have now been performed by Mr. and Mrs. Griffin, Silver Leaf East, LLC, Sabram Estates West, LLC and The Plantation, LLC."  R. 1678.  On December 19, 2011, Hill responded by email that Arvest did not yet acknowledge full performance by the debtors and stated, specifically, that Griffin had not paid the full cash amount due under the settlement agreement.  Because the debtors had not performed by any of the closing dates that Arvest had proposed in November, resulting in Arvest being required to seek an order from the Court to procure the documents to which it was entitled, Arvest declined to extend to the debtors the previously-offered credit for the For Cause payments against the cash component owed under the settlement agreement.  However, Griffin had deducted the $70,524.50 credit from the cash amount due under the settlement agreement.

Hill told Davidson that Griffin had to make the full cash payment under the settlement agreement by January 17, 2012.  On December 19, 2011, Davidson emailed Hill and Welch asking them to "confirm to me by the end of business tomorrow, December 20, 2011, that Arvest agrees that the Debtor parties to the Settlement Agreement have satisfied the terms of the Settlement Agreement and provide satisfactions of the Consent Judgment and return the Fawn Trail deed; otherwise, I will be filing a Motion to Compel Arvest to comply with the terms of the Settlement Agreement."  R. 1687.  Arvest responded through an email from Hill to Davidson, stating that Arvest did not believe the debtors had grounds to go back to the Court and it was Arvest's preference not to do so.

23

Arvest told Davidson that "Arvest is giving the Debtors the full time they have to perform (Jan 17, 2012).  Then we will proceed under the Settlement Agreement contract, and prior express orders.  It is that simple."  R. 1689.

The debtors filed their *Motion to Compel Arvest Bank's Delivery of Documents and Enforcement of Settlement Agreement* on December 20, 2011.  In the debtors' motion to compel, they asked the Court to enter an order requiring Arvest to:

> 1) honor its agreement by applying credit for the adequate protection payments made after the parties entered into the Settlement Agreement to the cash payments due under the Settlement Agreement, 2) file Satisfactions of the Consent Judgments in Arvest Bank's state court foreclosure cases against The Plantation, LLC, Silver Leaf East, LLC, and Sabram Estates West, LLC, 3) return the deed to the Fawn Trail property, and 4) pay the Debtor's attorney fees and costs incident to bringing this Motion.

R. 1729.  On January 9, 2012, Arvest responded to the debtors' motion to compel. Arvest argued in its response that "the Debtors seek enforcement of extraneous terms attempted to be negotiated but not contained in the Settlement Agreement or Court's Order approving the Settlement Agreement.  The Debtors have repeatedly attempted to re-negotiate the Settlement Agreement . . . ."  R. 1742.  On January 13, 2012, the Court issued an oral ruling denying Griffin's motion to compel.  The Court found that Arvest had made a conditional offer to give the debtors credit under the settlement agreement for the For Cause payments that had become due after the execution of the August 4, 2011 Settlement Agreement.  The Court found that Arvest had extended the conditional offer in an effort to motivate the debtors to finalize the settlement, but that Arvest was not required to make such a gift and was not bound by its offer because the debtors had not met the conditions that Arvest had placed on receiving the credit.[13]  The Court again instructed the parties to abide by the terms and conditions of the total settlement

---

[13]  Upon appeal by the debtors, the United States District Court for the Western District of Arkansas affirmed the Court's January 13, 2012 ruling in an order entered by the Honorable P. K. Holmes, III on September 21, 2012, in case number 2:10-CV-02084.

agreement.  R. 1866.

On January 13, 2012, Davidson emailed Hill and Welch to advise them that Griffin would pay the remaining $70,524.50 due under the settlement agreement to Bill Staed by Tuesday, January 17, 2012, and asked that Hill and Welch "direct Mr. Staed to deliver the deed to the Fawn Trail property to Mr. Griffin at the time Mr. Griffin delivers the subject cashier's check to Mr. Staed."[14]  R. 1869.  Davidson also directed Hill and Welch to proceed with releasing Arvest's claims in the bankruptcy cases and filing satisfactions of the consent judgments.  On January 16, 2012, Hill sent a letter by email to Davidson, stating, in part, that Arvest was not in agreement that Griffin had fully performed and

> [Arvest] has lost any confidence that the Debtors have, will, or can ever, timely and completely perform the Settlement Agreement and Order, regardless of what actions the Debtors take hereafter.  Nonetheless, Arvest will await the full time allotted for the Debtors to attempt performance. As an alternative to risking whether the Debtors can ever timely and fully perform at this point, Arvest is willing, subject to the terms hereof, to extend a gratuitous offer as specified hereafter, in order to provide assurance that Arvest will not claim remaining defaults by the Debtors.  In short, Arvest will: i) stipulate that the Debtors have timely, and fully, complied with all terms of the Settlement Agreement; ii) waive any non-compliance by the Debtors; iii) re-deliver the Fawn Trail deed and the consent judgments (none of which have been filed); and, iv) waive and release Arvest's claims in the bankruptcy proceedings
> . . . .
>
> The foregoing offer is subject to the following performance requirements from the Debtors:
> i) Mr. Griffin shall make full payment of the cash sums due under the Settlement Agreement ($70,524.50),
>
> ii) Mr. Griffin shall make, or shall cause Plantation, Silver Leaf East and\or Sabram Estates West to make, payment of attorneys fees awarded by the Court ($24,010.03),
>
> iii) **the foregoing payments shall be delivered to Arvest by cashier's**

---

[14]  The parties stipulated at trial that January 16, 2012, was a federal holiday, making the deadline for payment of cash under the Settlement Agreement January 17.

25

**check(s) on or before 4:00 p.m., on January 17, 2012,** and,

> iv) Arvest shall have the reserved right to request and receive title curative documents from the Debtors and\or non-debtor Griffin entities, as to any of the real property conveyed to Arvest under the Settlement Agreement, should same prove necessary, upon request with reasonable time (10 days) for performance.

R. 1871-72.  Arvest gave the debtors until 2:00 p.m. on January 17, 2012, to accept the offer.  On January 16, Davidson emailed Hill to express his opinion that the debtors had fully complied with the settlement agreement and to ask what Arvest believed the debtors had failed to do under the agreement.  Hill emailed Davidson at 10:58 a.m. on January 17 to advise him that

> Arvest's past efforts at confirming performance requirements under the Settlement Agreement, and assisting the timely completion of same, have been met, at each instance, with disputes and expensive evidentiary hearings.  Arvest's positions have been consistently affirmed, but at consistent further costs to Arvest, when it had hoped that further disputes with Mr. Griffin were over.  Therefore, Arvest will not voluntarily engage in yet further disputes with Mr. Griffin by sparring emails with you today.

> The Debtors have the obligation to perform, and have legal counsel to guide them.  If performance is not complete, and\or timely, the Settlement Agreement and order provide remedies.  Arvest will abide those terms.

> Alternatively, as our letter provided, Arvest has provided a means for the Debtors to have a level of assurance; at a cost that is not unreasonable or arbitrary, given that the Court oversaw the subject attorney fee award.  However, we are, likewise, not going to spend the day sparring over whether the Debtors will accept the offer, made in continuing good faith to get a file closed, but without obligation to proffer same to begin with.  It's a do - or don't activity for the Debtors; not another negotiation.

R. 1887.  The debtors did not take advantage of the offer outlined in Hill's January 16 letter.  Hill emailed Davidson the next day to reiterate that "Arvest does not acknowledge timely and full performance of the Settlement Agreement by the Debtors and other Griffin entities who were parties thereto."

On January 27, 2012, Davidson filed the debtors' *Second Motion to Compel Delivery of Documents and Enforcement of Settlement Agreement*, asking the Court to force Arvest to state specifically its basis for disagreeing with Davidson's assertion that the debtors had fully and timely complied with the settlement agreement and further requesting that the Court order Arvest to release its claims in the bankruptcy cases, file satisfactions of the consent judgments, and return to Griffin the deed to the Fawn Trail property.  R. 1874-79.  Arvest responded to the debtors' second motion to compel by alleging the ways in which it believed that the debtors had failed to fully and timely perform under the settlement agreement, resulting, in Arvest's view, to its entitlement to the remedies provided in the agreement.

Specifically, Arvest alleged that the debtors had breached the requirement to "fully and timely" perform because the debtors failed to deliver the documents and the entire cash sum required by the settlement agreement of their own volition.  Rather, Arvest argued, the debtors performed belatedly, partially, and only "under coercion of further orders of the Court" despite the language in the Agreed Order Approving Compromise that stated:

> **The Debtors are hereby** authorized and **directed to** take any and all actions, and prepare execute and file any and all documents necessary to **effectuate and implement the terms of the Settlement Agreement <u>without further order of this Court,</u>** including without limitation...

R. 1895 (emphasis Arvest's).  Arvest also alleged that the properties that Griffin had conveyed on behalf of the LLC debtors by warranty deed were subject to numerous title defects despite the August 4, 2011 Settlement Agreement, the Motion to Approve Compromise, the Agreed Order Approving Compromise, and the warranty deeds themselves requiring the debtors to convey clear title to Arvest.  R. 1897.[15]  Arvest alleged defective titles based upon the existence of: (1) "weed liens" on the Silver Leaf

---

[15]  Based upon the Court's December 12 order, the debtors executed deeds warranting that the subject properties were "free, clear and discharged of and from all former grants, charges, taxes, judgments, mortgages, liens and encumbrances of whatsoever nature" other than Arvest's mortgages, easements, and ad valorem taxes.

East property incurred in November 2011; (2) a mortgage held by Stinson on the Sabram Estates West property; and (3) clouds on the title to the Plantation property created by a defective acknowledgment and a missing release of dower clause on a warranty deed executed by Shirley and Kurt Berliner [the Berliner deed].  On February 15, 2012 (at a hearing on Arvest's and Bancorp South's respective objections to the debtors' proposed settlement with First American Bank), the Court directed the parties to try to resolve the outstanding issues impeding the finalization of the settlement agreement and report to the Court within 21 days the status of settlement efforts.  On March 8, 2012, the parties filed separate reports indicating that little, if any, progress had been made toward resolving the outstanding issues under the settlement agreement.

On March 13, 2012, the Court issued an order to show cause why the Court should not order the appointment of chapter 11 trustees in these cases (and continuing the hearing on the debtors' second motion to compel).  On April 12, 2012, Arvest filed a response to the Court's order to show cause and independently moved to appoint chapter 11 trustees.  The Court commenced the show-cause hearing on April 12, 2012, and at Davidson's request, continued and concluded the hearing on June 6, 2012.  On June 8, 2012, the Court orally ruled that the appointment of trustees was warranted but that the debtors could avoid the appointment of trustees if they strictly complied with conditions imposed by the Court within 30 days.  As part of its June 8 oral ruling, the Court ordered Arvest to inform Griffin within 7 days what Arvest believed the debtors were required to do in order to consummate the settlement agreement and resolve any additional outstanding matters between the parties.  The Court ordered Arvest and Griffin to negotiate in good faith toward a final and permanent resolution of all matters still in controversy.  Once again, negotiations foundered.  On July 11, 2012, the Court entered an order appointing trustees.

**Summary of Trustee's Argument and Arvest's Response**

On April 3, 2013, the trustee appointed in this case filed the Motion to Enforce the debtors' settlement with Arvest that is now before the Court.  The trustee argues that the

28

debtors timely and fully performed their obligations under the settlement agreement, or, in the alternative, that the debtors substantially performed their obligations under the settlement agreement and that substantial performance is sufficient to obligate Arvest to release the Fawn Trail deed back to Griffin, withdraw its proofs of claim in the bankruptcy cases, and file satisfactions of the consent judgments in the state court foreclosure actions.  Arvest contends in response that the debtors performed their obligations under the settlement agreement belatedly, partially, and only after the Court entered additional orders compelling them to do what they should have already done voluntarily under the settlement agreement, namely–deliver the documents and pay the entire amount of cash specified under the agreement.  Arvest also argues as a basis for the debtors' default that some of the properties that the debtors transferred to Arvest were not free and clear of liens and encumbrances as required by the August 4, 2011 Settlement Agreement, the Motion to Approve Compromise, the Agreed Order Approving Compromise, and the warranty deeds themselves.  Arvest contends that the doctrine of substantial compliance advanced by the trustee is applicable only in construction cases and is inapposite to the situation before the Court.[16]

### Findings of Fact and Conclusions of Law

"'Settlement agreements are generally construed according to the principles of contract law.'"  *Fanning v. Potter*, 614 F.3d 845, 848 n.2 (8th Cir. 2010) (quoting *Myers v. Richland Cty*, 429 F.3d 740, 749 (8th Cir. 2005)).  Contracts are ordinarily interpreted according to state law.  *Id.*  Unless a party raises a choice-of-law claim, the law of the forum state (in this case, Arkansas) applies.  *Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010).

---

[16]  Despite the apparent length of the background section, the Court did not attempt to recite the parties' entire history in the Background section of this order.  Rather, the Court endeavored only to touch upon the wayposts relevant to the resolution of the matter currently before the Court.

To resolve the trustee's Motion to Enforce the debtors' settlement agreement with Arvest, the Court must first determine whether the debtors complied with a recurrent provision in the parties' settlement agreement that specifically required the debtors to both timely and fully perform in order to be entitled to Arvest's performance.[17]  If the Court finds in its initial inquiry that the debtors did not timely and fully comply with the terms of the settlement, the Court must then determine whether the application of the doctrine of substantial compliance is appropriate in this case.  If the Court finds that the debtors failed to perform their obligations (either timely and fully, or–if the doctrine applies–substantially), the Court, finally, must determine whether it may equitably annul Arvest's contractual remedies under the settlement agreement.

As a preliminary matter, the Court finds that the settlement agreement reached by the debtors and Arvest encompasses the terms contained in three documents that refer to and incorporate one another: the August 4, 2011 Settlement Agreement, the Motion to Approve Compromise, and the Agreed Order Approving Compromise.  *See Ingersoll-Rand Co. v. El Dorado Chem. Co.*, 283 S.W.3d 191, 196 (Ark. 2008) ("When a contract refers to another writing and makes the terms of that writing a part of the contract, the two documents become a single agreement between the parties and must be construed together.")  Paragraph 9 of the August 4, 2011 Settlement Agreement stated that the agreement was binding on the parties to the agreement subject only to Court approval "pursuant to a Compromise Motion, in form acceptable to all parties hereto."  The Motion to Approve Compromise incorporated the August 4, 2011 Settlement Agreement by reference, added and clarified terms, and provided that, in the event of a conflict

---

[17]  As discussed below in section I., one of Arvest's overarching objectives in entering into the settlement agreement was to quickly and permanently disengage from the debtors and end the litigation expenses that Arvest was continually accruing as a result of its relationship with Griffin and the LLC debtors.  To that end, Arvest's performance under the agreement was contingent upon the debtors' timely and full performance–a condition that was repeated five times in the August 4, 2011 Settlement Agreement, and reiterated in the Motion to Approve Compromise and Agreed Order Approving Compromise.

between a term in the Motion to Approve Settlement and a term in the August 4, 2011 Settlement Agreement, the August 4, 2011 Settlement Agreement controlled. The Court's entry of the Agreed Order Approving Compromise (signed by the parties' respective counsel) made the parties' settlement (as contained in both the August 4, 2011 Settlement Agreement and the Motion to Approve Compromise) enforceable pursuant to Federal Rule of Bankruptcy Procedure 9019(a). *Am. Prairie Constr. Co. v. Hoich*, 594 F.3d 1015, 1024 (8th Cir. 2010) (in the context of a chapter 11 case, a settlement is not enforceable until the court approves it).

## I. Timely and full performance under the Settlement Agreement

When interpreting a contract under Arkansas law, a court is to give the language employed by the parties the meaning that the parties intended. *Singletary v. Singletary*, No. CV-13-587, 2013 Ark. Lexis 608, at *10 (Ark. Dec. 12, 2013) (*citing Wal-Mart Stores, Inc. v. Coughlin*, 255 S.W.3d. 424, 429 (Ark. 2007). A court is to "consider the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning" and gather the intention of the parties "from the whole context of the agreement." *Id.* In determining the parties' intent regarding the meaning of their contract, courts may afford considerable weight to the "subsequent statements, acts, and conduct" of the parties themselves. *Id.* (citing *Rockefeller v. Rockefeller*, 980 S.W.2d 255 (Ark. 1998)). Therefore, the Court will give the language of the settlement agreement the meaning that the parties' intended by examining the plain and ordinary meaning of the words that they chose to designate the debtors' "timely" and "full" performance within the full context of their agreement. In evaluating what the parties intended for the words of their agreement to mean, the Court may also be guided by the parties' statements, acts, and conduct after entering into the agreement.

The settlement agreement was executed by Arvest and the debtors in the context of an increasingly adversarial relationship that had evolved over many years spent opposing one another in expensive and futile litigation as Arvest endeavored (both before and after the debtors filed their respective bankruptcies) to collect millions of dollars that Griffin

31

and the LLC debtors owed to it, while Griffin, in turn, executed largely successful
strategies designed to forestall Arvest's collection efforts.[18]  Bill Staed testified that
Arvest reached the settlement with the debtors in order to quickly and finally disentangle
Arvest from Griffin while recouping a portion of the money that Arvest had been unable
to collect since prior to the debtors filing their bankruptcies.  Mot. To Enforce Hr'g Tr.
vol. I, 161, Nov. 6, 2013.  Staed testified that extricating Arvest from Griffin was a major
component of the settlement agreement from Arvest's perspective.  Staed further testified
that  "the bank wanted to be done.  I've said that before, I'll say it again.  We wanted to
be finished.  We wanted out.  Enough.  That's all we wanted."  Mot. To Enforce Hr'g Tr.
vol. II, 247-48, Dec. 9, 2013.  Staed also testified that Arvest desperately wanted the

---

[18]  When Plantation's loans matured in 2007, Arvest extended the maturity dates
three times: to two successive dates in 2008, and, finally, to 2011.  Under the terms of the
final extension, Plantation was required to make quarterly payments beginning on
September 22, 2008.  After the final extension, Plantation never made a payment.  On
June 22, 2009, Arvest filed a state court foreclosure action against Plantation (and
Griffin, as guarantor of Plantation's loan).  On May 5, 2010, the state court notified the
parties by letter that it granted Arvest's motion for summary judgment.  On May 12,
2010, before an order was entered in the state court case in favor of Arvest, Plantation
filed its first bankruptcy case (assigned case number 5:10-bk-72525 and referred to as
"Plantation I"), staying the state court foreclosure.  On May 17, 2010, Arvest filed a
motion for relief from stay in Plantation I, and on June 4, 2010, Arvest filed a motion to
dismiss Plantation I.  Plantation I was dismissed by agreed order on June 10, 2010.

Robert and Julia Griffin filed the case that is currently before the Court on June 6, 2010.
The same day, Griffin, through his attorney, sent a letter to the state court alleging that
the automatic stay in Griffin's case precluded the state court from entering the
foreclosure order in Plantation's case.  The state court proceeded with the entry of the
foreclosure order on July 16, 2010, and a foreclosure sale was scheduled for September 9,
2010.  On August 3, 2010, Davidson filed an adversary proceeding on behalf of Griffin
seeking a temporary restraining order against Arvest to stop the Plantation foreclosure
sale.  On September 8, 2010, the Court held a hearing on Griffin's adversary proceeding
and denied his request for a temporary restraining order against Arvest.  R. 332.  The
same day, Davidson filed Plantation's second bankruptcy case, preventing Arvest from
foreclosing yet again.  A similar chain of events unfolded in relation to Silver Leaf East
and Sabram Estates West, likewise resulting in state court foreclosure actions that were
stayed (after this Court's denial of Griffin's request for injunctive relief) when the
debtors filed bankruptcy in September 2010.  R. 1-116, 306-39, 852-908, 2085-94.6;
Mot. To Enforce Hr'g Tr. vol. II, 179-94, Dec. 9, 2013.

litigation expenses associated with Griffin to come to a conclusion, and that Arvest was willing to walk away from more than three million dollars to accomplish that goal.  Mot. To Enforce Hr'g Tr. vol. II, 247-48, Dec. 9, 2013.

In order to effectuate Arvest's goal of promptly and permanently parting ways with the debtors, the parties' two-page August 4, 2011 Settlement Agreement contained no fewer than five reiterations of the single prerequisite that the debtors had to fulfill in order to trigger Arvest's obligations under the agreement to deem satisfied any remaining deficiencies, withdraw its claims, and release the Fawn Trail property back to Griffin: the debtors had to timely and fully perform their end of the bargain first.  Conversely, the Settlement Agreement provided that, if the debtors did not meet this prerequisite, Arvest would be entitled to pursue its proofs of claims, collect any remaining deficiencies, and retain the Fawn Trail property.  The debtors' obligation to fully and timely perform the terms of the settlement in order to reap the benefit offered by Arvest (while simultaneously precluding Arvest's entitlement to the agreed-upon remedies) was repeated in the Motion to Approve Compromise and in the Agreed Order Approving Compromise that referenced Arvest's ability to "exercise all remedies as set forth in the Settlement Agreement if the Debtors do not timely and fully consummate the Settlement Agreement."

### A. Timely performance

In an anomalous display of accord, the trustee and Arvest agree on two foundational issues: first, that the settlement agreement provided two specific time frames within which the debtors had to make cash payments to Arvest (and that the debtors timely made those payments); second, that the settlement agreement did not similarly specify the time frame within which the debtors were required to deliver to Arvest the warranty deeds, consent judgments, and release [collectively, the documents].  The trustee argues that because the settlement agreement was devoid of a specific time frame for the debtors to deliver the documents to Arvest, the debtors delivered them timely on December 16, 2011, in compliance with the Court's December 12, 2011 order granting Arvest's motion

33

to compel.  Arvest, obviously, disagrees.

### 1. Transfers of property

Although the settlement agreement did not provide a specific date by which the debtors were required to transfer the subject properties to Arvest, paragraphs 10.1 through 10.5 of the Motion to Approve Compromise stated that "*upon* approval" each LLC debtor (and one non-debtor company owned by Griffin) will "transfer by warranty deed" certain property to Arvest "free and clear of any liens, claims and encumbrances of any third parties pursuant to 11 U.S.C. § 363(b) and (f), excepting only for: (i) ad valorem real estate taxes."[19]  R. 812-13.  Merriam-Webster defines "upon" (by reference to the definition for "on") as "during or at the time of."  *Merriam-Webster's Collegiate Dictionary* (11th ed. 2012).  The *Oxford American Dictionary* defines "upon" as "exactly at, during."  *Oxford American Dictionary* (1980).  Because Arvest does not contend that the debtors were required to instantaneously transfer the properties to Arvest at the precise moment of the Court's approval of the settlement agreement (nor does the Court imagine such a feat would have been possible), the Court will examine what the parties intended for "upon" to mean within the context of their entire agreement.  Specifically, the Court will look to the four corners of the parties' agreement (as memorialized in the August 4, 2011 Settlement Agreement, Motion to Approve Compromise, and Agreed Order Approving Compromise) to ascertain whether the parties intended for the debtors to transfer the properties to Arvest before, after, or concurrently with the performance of the debtors' other obligations under the agreement (particularly those upon which the parties *did* impose explicit deadlines).

The parties agree that the debtors had to make the first cash payment to Arvest within 30 days of the Court's October 17, 2011 approval of the settlement and the second within 90

---

[19]  Because the August 4, 2011 Settlement Agreement was silent as to the timing for the debtors' delivery of the documents, the Motion to Approve Compromise did not conflict with the August 4, 2011 Settlement Agreement on this issue, but clarified it.

days of the Court's approval (unless Griffin could not come up with the funds for the second payment, in which case the parties had agreed that Arvest would retain the Fawn Trail property in lieu of the last payment). As noted above, the Motion to Approve Compromise provided that "upon" Court approval, the debtors "will transfer" the subject properties by warranty deed. In contrast to the "*upon* approval" language governing the debtors' transfers of property to Arvest in paragraphs 10.1 through 10.5 of the Motion to Approve Compromise, paragraph 10.6 of the Motion to Approve Compromise (addressing cash payments) states that "*following* approval" Griffin will make the cash payments according to the timing schedule set forth in the Settlement Agreement." The word "following" is defined as "that comes after or next in order of time." *Id.* Based upon the plain meaning of the language chosen by the parties and viewed within the context of the entire agreement, the Court finds that the parties intended for the debtors to transfer the subject properties as near to the Court's October 17, 2011 approval of the settlement as practicable, but, in any event, before the expiration of the 30 day clock that the parties had imposed upon the delivery of the first cash payment to Arvest that commenced running on October 17, 2011, and ended on November 16, 2011. Therefore, the Court finds that the debtors were required to execute and deliver the warranty deeds to Arvest by November 16, 2011, in order to timely transfer the subject properties to Arvest under their agreement.

The Court's interpretation of the parties' intended sequence of events under the settlement agreement is reinforced by the parties' communications regarding the debtors' delay in transferring the properties to Arvest after the Court entered the Agreed Order Approving Compromise on October 17, 2011. Although the settlement agreement did not state which party was responsible for drafting the deeds transferring the subject properties to Arvest, evidently the parties agreed that Arvest would do so with Griffin's assistance in providing certain legal descriptions. On October 31, 2011, Welch first sent Davidson a proposed set of warranty deeds (without the benefit of the legal descriptions that Griffin was supposed to provide to Arvest). Welch received no response from Davidson regarding the proposed deeds until after Welch emailed Davidson on

35

November 3, 2011, to express Arvest's disappointment in the debtors' lack of response to the proposed documents, and to seek confirmation from Davidson that the debtors "were not willing to timely perform under the Settlement Agreement, now 16 days after the entry of the Order." R. 1100. Welch warned Davidson that if the debtors failed to transfer the properties by November 7 (a date that was more than a week prior to the deadline for the first cash payment), Arvest would declare the debtors to be in breach of the settlement agreement. Davidson responded the next day, and, notably, did not argue that it was too early for Arvest to properly declare a breach based upon the debtors' failure to have transferred the properties by that point in time. Rather, he asked Arvest to be patient. R. 1104. The next day, November 4, 2011, Davidson requested minor corrections to the warranty deeds (that Welch immediately agreed to make), and asked Arvest to "bear with him." R. 1109.

Apparently, a few days later the debtors experienced a change of heart regarding their agreement to execute warranty (rather than quitclaim) deeds, further delaying the debtors' transfer of the properties to Arvest. On November 8, 2011, Welch questioned Davidson regarding why Griffin had contacted Staed directly and stressed to Davidson that "there is nothing further for the parties to discuss in this matter and we need to complete the documentation, execute and deliver the documents. We are waiting on you." R. 1114. On November 9, 2011, Davidson informed Arvest that Griffin would not agree to execute warranty deeds (as specified in paragraphs 1, 2, and 3 of the August 4, 2011 Settlement Agreement, the Motion to Approve Compromise, and the Agreed Order Approving Compromise–signed and approved by Davidson) because paragraph 4 of the August 4, 2011 Settlement Agreement made a single reference to quitclaim deeds. Davidson also argued to Welch on November 9 that quitclaim rather than warranty deeds were necessary "[b]ecause certain lots and tracts of the subject subdivisions have been transferred through the years, Mr. Griffin simply cannot warrant good title to the subject properties without having to get extensive title work and insurance to verify what

36

remains that he would be warranting title to." [20]  At the conclusion of Davidson's November 9 email, he attempted to substantially renegotiate the settlement agreement with Arvest to obtain terms more favorable to the debtors.  Welch responded to Davidson on November 14, patently rejecting the debtors' attempts to renegotiate the deal, and attaching the "FINAL" version of the closing documents.  Welch conveyed to Davidson that the debtors were to deliver all documents (including the warranty deeds) *with* the first cash payment no later than 5:00 p.m. on November 16, 2011–the 30th day after the Court approved the settlement.  When the debtors missed the November 16 deadline, Arvest offered the debtors a brief extension (to November 18, 2011, at 2:30 p.m.) to timely deliver the documents.[21]  To their detriment, the debtors chose not to take advantage of the reprieve offered by Arvest, and Arvest proceeded with its motion to compel.

For the above-stated reasons, the Court finds that, although the debtors eventually transferred the subject properties to Arvest by warranty deeds on December 16, 2011–one month after the November 16 deadline and pursuant to the Court's December 12, 2011 order compelling them to do so–they did not timely perform their obligation under the settlement agreement to timely do so. [22]

---

[20]  Despite Davidson's November 9, 2011 realization that *extensive* title work was necessary in order for the debtors to warrant clear title, the debtors chose not to obtain *any* title work until after December 12, 2011, when the Court ordered the debtors to deliver the delinquent documents (including warranty deeds) to Arvest within four days.

[21]  After the November 16, 2011 deadline had expired, Arvest's offer to extend the deadline to November 18 did not constitute a waiver of Arvest's contractual remedies for the debtors' breach of their obligation to deliver the documents by November 16, 2011. *See In re Guido*, 345 B.R. 656, 662-63 (Bankr. E.D. Ark. 2006) (when a deadline for performance has expired, the granting of a short extension that still fails to elicit the defaulting party's performance does not preclude the party that extended the deadline from enforcing its contractual remedies for the defaulting party's breach of the original deadline.)

[22]  At the November 6, 2013 hearing on the instant Motion to Enforce, the trustee
(continued...)

## 2. Delivery of releases

Paragraph 10.7 of the Motion to Approve Compromise governs the debtors' duty to release Arvest "as specified in the Settlement Agreement."  Paragraph 8 of the August 4, 2011 Settlement Agreement provides that "[e]ffective *on* Bankruptcy Court [a]pproval," the debtors shall unconditionally release Arvest from any and all claims of any kind. "On" (synonymous with the word "upon" used in paragraphs 10.1 through 10.5 of the Motion to Approve Compromise), means "at the time of." *Merriam-Webster's Collegiate Dictionary* (11th ed. 2012).  Therefore, the Court finds that the parties' use of the phrase "[e]ffective *on* Bankruptcy Court [a]pproval" signifies that the debtors were to provide the releases to Arvest as near to "at the time" of Court approval as possible. Arvest provided Davidson with drafts of the releases on October 31, 2011.  Although Davidson never voiced any issues or problems with the language of the releases, the debtors did not deliver them to Arvest until December 16, 2011, and then only after the

---

[22](...continued)
introduced evidence that Arvest's August 16, 2011 Motion to Approve Compromise and its November 18, 2011 Motion to Compel included as exhibits a warranty deed for the Plantation property that contained an incorrect legal description (apparently gleaned from the Plantation's pre-bankruptcy mortgage with Arvest).  The trustee argues that, as a result, the Court ordered Griffin on December 12, 2011, to execute an incorrect warranty deed for the Plantation property.

The Court finds that Davidson (and therefore, Griffin) knew that Arvest was working with incorrect legal descriptions prior to the Court entering the Agreed Order Approving Compromise on October 17, 2011–signed by Davidson–as evidenced by his email to Welch on October 14, 2011, in which he stated "I don't know the best way to address this other than to agree that the legal description [sic] in the proposed Order are incorrect . . . ."  R. 1080.

The Court further finds that had Griffin performed the title work that Davidson recognized was necessary as early as November 9, 2011, the debtors ostensibly could have raised the issue of the incorrect legal description for the Plantation property in response to Arvest's motion to compel, or alternatively, in response to the Court's December 12, 2011 order compelling the debtors to deliver the deeds that Arvest had drafted.  The burden was on the debtors–not on Arvest and not on the Court–to take whatever steps were necessary to verify the legal descriptions prior to executing the required warranty deeds.

Court ordered them to do so on December 12, 2011.  Therefore, the Court finds that the debtors did not timely deliver the releases.

### 3.  Delivery of consent judgments

Paragraph 10.9 of the Motion to Approve Compromise governs the debtors' obligation to provide consent judgments to Arvest by incorporating the "various other terms and conditions of the compromise" as contained in the August 4, 2011 Settlement Agreement. Paragraph 5 of the August 4, 2011 Settlement Agreement addressed the consent judgments, stating that "if Griffin does not timely perform according to this agreement and satisfy any payments required herein, Arvest shall be entitled to immediately present confessed judgments for entry in the State Court Actions . . . ."  As the Court stated on December 7, 2011, during the hearing on Arvest's motion to compel, "the consent judgments [go] to everything" and were to "be provided for all matters, not just payment of money.  [They were] to be for the performance of the whole agreement."  R. 1656. Because the debtors' obligations under the settlement agreement became enforceable upon the Court's approval of the agreement, the Court finds that Arvest was entitled to receive the consent judgments on (or as soon as practicable after) the Court's October 17, 2011 approval of the settlement agreement, but no later than November 16, 2011 (the deadline for debtors' delivery of the first cash payment under the agreement, that, if missed, entitled Arvest to file the consent judgments).

The Court's interpretation of the parties' agreement regarding when the debtors were required to deliver the consent judgments is supported by Davidson's November 9, 2011 email to Welch, in which Davidson stated that Griffin's "failure to, for example, to pay the $450,000 (less credit for the adequate protection payments) by November 16, 2011 would trigger a default.  In that event, Arvest would be entitled under the Settlement Agreement to file [judgments] in the State Court actions . . . ."  R. 1118.  By acknowledging to Welch that Arvest could properly *file* the consent judgments on November 16, 2011, Davidson's illustration of a breach demonstrates that the debtors were aware that Arvest was entitled to the *delivery* of the consent judgments by (or

before) that date.

The debtors again exhibited a clear understanding of the agreed-upon timing for the delivery of the consent judgments in response to Arvest's motion to compel.  To support their objection to Arvest's motion to compel the debtors to deliver the consent judgments, Fawn Trail deed, and releases, the debtors argued that once they had transferred the subject properties and paid the cash amounts due under the settlement agreement, the remaining documents that Arvest was seeking (specifically, the consent judgments and the Fawn Trail deed) were no longer necessary.  In making this argument, the debtors expressly admitted their understanding that the consent judgments and the Fawn Trail deed were intended by the parties to secure the debtors' *future* performance under the settlement agreement.  Although the debtors eventually provided the consent judgments to Arvest on December 16, 2011–two months after the Court entered the Agreed Order Approving Compromise and four days after the Court's order compelling the debtors to deliver them–the Court finds that the debtors' delivery of the consent judgments was not timely.

For the above-stated reasons, the Court finds that the debtors failed to timely perform their obligations as required by the settlement agreement.[23]   The Court next addresses

---

[23]  The trustee argues that Arvest unilaterally and inappropriately chose arbitrary deadlines for the debtors' "timely" delivery of the documents.  However, the record reflects that in the initial days and weeks after the Court approved the settlement, Arvest solicited the debtors' input to schedule a time for the debtors to deliver the documents to Arvest and expressed Staed's willingness to close at a place convenient to the debtors. Only after the debtors summarily dismissed Arvest's repeated attempts to schedule a mutually agreeable closing date and location did Arvest resort to attempting to schedule closing dates without first inviting the debtors' opinion.  Arvest proposed not one but four closing dates prior to filing its November 18, 2011 motion to compel (specifically, November 2, 2011; November 7, 2011; November 9, 2011; and November 16, 2011). Although Davidson both implicitly and explicitly recognized that time was of the essence for the debtors' delivery of the documents (by telling Arvest on Friday, November 4, 2011, that he would work with Griffin during the upcoming weekend to "address any

(continued...)

whether the debtors fully performed their obligations under the settlement agreement.

### B. Full Performance

Arvest argues that the debtors failed to fully perform their obligations under the settlement agreement because: (1) they did not timely perform; and (2) they failed to transfer clear title to Arvest as mandated by the August 4, 2011 Settlement Agreement, the Motion to Approve Compromise, and the Agreed Order Approving Compromise. The debtors' failure to perform timely is discussed in section I.A.; the Court, therefore, will move directly to the second problem with the debtors' collective performance: three of the LLC debtors' failure to transfer clear title to Arvest.

On November 17, 2011, Welch stressed to Davidson that Arvest had not bargained for further litigation with Griffin in the form of foreclosure or quiet title actions in the event that the debtors had created encumbrances or other title defects on the subject properties since filing their respective bankruptcies.  Arvest's concern that the debtors might have created post-petition title problems was justified.  Two of the LLC debtors (Silver Leaf East and Stinson) had, in fact, created or permitted post-petition encumbrances on the subject properties, and a third LLC debtor's (Plantation's) chain of title was, at least on its face, defective.  Each of the title defects will be discussed in turn below.

Silver Leaf East had accrued thousands of dollars of "weed liens" on its Oklahoma property as a result of not mowing the property in 2010 [the 2010 weed liens].  As stated in footnote 5 above, Oklahoma municipalities (in this case, the City of Oklahoma City) may remove trash and weeds from property within its municipal limits at the property owner's expense.  11 Okl. St. § 22-111.  If the property owner does not pay the amount billed by the municipality for mowing the property, a lien "superior to all other titles and

---

[23](...continued)
issues we don't get resolved today," and by stating to Welch that "time was of the essence" on November 15, 2011), the debtors ignored Arvest's proposed closing dates and offered no alternative dates.  R. 1109, 1133.

liens against the property" attaches to the property.  11 Okl. St. § 22-111(6).  On October 31, 2011, Arvest alerted the debtors that the City of Oklahoma City had placed the 2010 weed liens on the Silver Leaf East property.  On November 15, 2011, Davidson conveyed to Welch that Griffin would pay the 2010 weed liens the following day, on November 16, 2011.  Arvest acknowledges that Griffin paid the 2010 weed liens.

However, on November 10, 2011, November 15, 2011, and November 16, 2011, the City of Oklahoma City served *additional* notices to Silver Leaf East that it was in violation of ordinances prohibiting tall grass and weeds from growing on the property.  The notices stated that if Silver Leaf East did not abate the nuisances within ten days, the City of Oklahoma City would (as it had done before) mow the property and bill Silver Leaf East for doing so.  R. 1918-40.  Silver Leaf East did not abate the nuisances by mowing the property within the time specified on the notices and the City of Oklahoma City subsequently billed Silver Leaf East for mowing the property.  Silver Leaf East did not pay the bills, and additional weed liens [the 2011 weed liens] subsequently attached to the property.  Although Arvest was aware only of the 2010 weed liens at the time, Arvest specifically told the debtors on November 17, 2011, that the debtors had to make "full payment of the weed liens" to comply with the settlement agreement.[24]

A transfer of property under a settlement agreement must comply with 11 U.S.C. § 363. *Peltz v. Gulfcoast Workstation Group* (*In re Bridge Info. Sys.*), 293 BR. 479, 485 (Bank. E.D. Mo. 2003).  Accordingly, the Motion to Approve Compromise and the Agreed Order Approving Compromise specified that the debtors would transfer the subject properties to Arvest "free and clear of any and all liens, claims and encumbrances of any third parties pursuant to 11 U.S.C. §§ 363(b) and (f), excepting only for: (i) *ad valorem* real estate taxes . . . ."  The trustee argues that, because the Agreed Order Approving

---

[24]  In May 2013–over one year after being appointed as trustee in this case and one month after he filed his Motion to Enforce–the trustee paid Arvest the amount of the 2011 weed liens.

Compromise stated that the property transferred by the debtors would be free and clear of any and all liens, claims, and encumbrances, "Arvest received the most perfect title anyone can have to a piece of property."  Trustee's Post-Trial Br. p. 7.

However, a review of the Court's docket reflects that the City of Oklahoma City was never served with the Motion to Approve Compromise stating that Silver Leaf East was seeking to transfer its property free and clear of liens and encumbrances.  If proper notice under § 363 is not given to an affected lienholder, a transferee takes the property subject to the lien of that unnoticed party.  *Walker v. Lee* (*In re Rounds*), 229 BR. 758, 763-64 (Bank. W.D. Ark. 1999).  The burden of furnishing notice of the proposed transfer to all entities holding claims, as well as to any parties whose pecuniary interests might be directly and adversely affected by the transfer, is on the trustee or debtor in possession.  *Id.* (citing *Western Auto Supply Co. v. Savage Arms, Inc.* (*In re Savage Indust., Inc.*), 43 F.3d 714, 720-21 (1st Cir. 1994)).  Because Silver Leaf East did not serve the City of the Oklahoma City with notice of the proposed transfer under § 363, Griffin transferred the Silver Leaf East property to Arvest encumbered by the 2011 weed liens–liens that are superior to all other secured liens under Oklahoma law by statute.  Therefore, the Court finds that Silver Leaf East did not comply with the terms of the settlement agreement that required the debtors to transfer their respective properties to Arvest free and clear of all liens and encumbrances except those specifically excluded by agreement of the parties.[25]  The Court also finds that the trustee's payment of the 2011 weed liens in May 2013 is not tantamount to performance by the debtors.  *Riesett v. W.B. Doner & Co.*, 293 F.3d 164, 172-73 (4th Cir. 2002) (curing a breach is insufficient to establish performance).

---

[25]  The trustee argued in his post-trial brief that Hill had indicated in his opening statement that Arvest was not claiming that the 2011 weed liens constituted a breach of Silver Leaf East's obligations under the Settlement Agreement.  However, the transcript of the November 6, 2013 hearing reflects that Hill stated in reference to the 2011 weed liens that "there wasn't just one 2450 dollar weed lien out there . . . .   I understand that perhaps those title defects, standing alone, if that's all it was–if that's all this dispute was about, we wouldn't be here. . . .  But they're here, Judge.  If we're going to litigate it, we're going to put it all out there."  Mot. to Enforce Hr'g Tr. vol. I, 34, Nov. 6, 2013.

Additionally, Griffin transferred the Stinson property to Arvest encumbered by a mortgage held by debtor Sabram Estates West and transferred the Plantation title subject to defects in the chain of title arising from the Berliner deed.  The trustee argues–and Arvest does not dispute–that Arkansas law provides remedies for breaching the warranty provided in a warranty deed.  The trustee argues that the defects are easily cured (or easily defended) under state law.  Had the settlement agreement not specifically required the debtors to transfer the subject properties free and clear of any and all liens and encumbrances, Arvest's recourse might lie solely in the pursuit of state court remedies for breach of warranty.  However, that is not the situation before the Court.  The August 4, 2011 Settlement Agreement, Motion to Approve Compromise, and Agreed Order Approving Compromise required the debtors to transfer the subject property free and clear of any and all liens and encumbrances.  The potential availability of state-law curative measures for clouds on title, remedies for breach of warranty, or the existence of viable defenses (should Arvest encounter a lawsuit based upon chain of title issues) does not ameliorate the fact that Griffin transferred the Stinson and Plantation properties to Arvest with clouds on the titles, thereby making some further action on Arvest's part–no matter how trivial in the trustee's eyes–necessary for Arvest to obtain what it had bargained for: clear title.  Therefore, the Court finds that Stinson and Plantation failed to fully comply with the settlement agreement.  For the reasons enumerated in section I., the Court finds that the debtors failed to timely and fully perform their obligations under the settlement agreement.

## II.     Applicability of Substantial Performance

The trustee argues that, in the event that the Court finds that the debtors did not fully perform their obligations under the settlement agreement, they substantially performed their obligations by eventually paying Arvest the entire cash component agreed upon in the settlement agreement, and transferring to Arvest the subject properties (despite the title defects discussed above).  The trustee argues that in the light of the debtors' substantial performance, the Court must compel Arvest to return the Fawn Trail deed to Griffin, withdraw its proofs of claim, and file satisfactions of the consent judgments.

Arvest contends in response that the doctrine of substantial performance applies only to construction contracts and is inappropriate in this case.  In the alternative, Arvest argues that if the Court finds that the application of the doctrine of substantial performance is appropriate, the debtors did not substantially perform.

As previously stated, Arkansas law (as the forum state in the absence of a choice-of-law dispute) applies to the construction of the settlement agreement.  *See McDonough*, 608 F.3d at 390.  The doctrine of substantial performance is applied by Arkansas courts to allow a party to recover under a contract despite the fact that it has breached the contract in some immaterial manner.  *Prudential Ins. Co. v. Stratton*, 685 S.W.2d 818, 821 (Ark. Ct. App. 1985).  Substantial performance is "designed to avoid forfeiture of a contract when a minor breach occurs."  *Bath & Beyond v. Bed Bath & Beyond*, No. C-91-1097-VRW (JPV), 1996 U.S. Dist. Lexis 21078, at *7 (N.D. Cal. 1996).  Although courts generally apply the doctrine of substantial performance to construction contracts, it could potentially apply to any type of contract.  *Stratton*, 685 S.W.2d at 821.

The doctrine's potential applicability to any *type* of contract does not mean, however, that the doctrine is properly applied to *every* contract.  The doctrine of substantial performance does "not extend to cases . . . where [a party] insisted upon strict compliance with its conditions and has never waived them."[26]  *Hardin, Rodriguez & Boivin*

---

[26]  The trustee contends that Arvest waived its right to insist upon the debtors' full and timely performance of the settlement terms when it filed its November 18, 2011 motion to compel.  The trustee argues that if Arvest was intent upon enforcing the debtors' timely and full (i.e., strict) performance, then Arvest's proper course of action would have been to declare the debtors to be in default rather than filing a motion to compel.  The trustee argues that by filing its motion to compel, Arvest implicitly accepted the debtors' substantial performance and is now estopped from declaring that the debtors breached the agreement by failing to comply strictly with the terms of the settlement requiring full and timely performance.

Under Arkansas law, if a party to a contract discovers that the other party has breached the contract but fails to immediately declare the breach and, instead, continues to accept

(continued...)

45

*Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 636 (7th Cir. 1991) (citing *Jacob & Youngs, Inc. v. Kent*, 129 N.E. 889 (N.Y. 1921)).  As discussed at length in section I., Arvest bargained for the debtors' timely and full performance, or, stated differently, their strict performance.  There is no evidence before the Court that Arvest waived the contractual provisions mandating the debtors' timely and full performance as a prerequisite to its own performance.  In fact, Arvest consistently and frequently reminded the debtors that Arvest would *not* be obligated to perform under the agreement (by releasing the Fawn Trail property, forgiving the deficiencies, and deeming the

---

²⁶(...continued)
benefits under the contract, then the non-defaulting party may have waived its right to insist upon a forfeiture.  *Jet Asphalt & Rock. Co. v. Angelo Iafrate Constr., LLC*, 431 F.3d 613, 617-18 (8th Cir. 2005).  In this case, Arvest did not remain silent when the debtors breached the agreement in order to declare a surprise forfeiture at a later date.  To the contrary, Arvest repeatedly warned the debtors prior to their impending breaches of the settlement agreement through emails to Davidson.  By way of example: on October 31, 2011, Arvest notified the debtors of the weed liens on the Silver Leaf East property; on November 3, 2011, Arvest told the debtors that if they did not deliver the documents by November 7, 2011, Arvest would declare a breach of the agreement; on November 14, 2011, Arvest reiterated that full and timely performance necessitated and included the debtors' delivery of all documents to Arvest no later than November 16, 2011 (and stated its intention to enforce the remedies provided by the Settlement Agreement in the event of the debtors' breach by filing a motion to compel); on November 15, 2011, Arvest told the debtors that Arvest would consider it a breach of the settlement if the debtors did not make full payment of the weed liens.

When the debtors breached the agreement, Arvest embarked upon the precise course of action that it had previously mapped out for the debtors: it filed its November 18, 2011 motion to compel.  Contrary to the trustee's assertion, Arvest's motion to compel included a declaration of the debtors' default.  Arvest sought the enforcement of the settlement agreement–including the remedies contained in the agreement.  Arvest has consistently argued against the settlement agreement's forfeiture and in favor of its enforcement, rendering the application of the doctrine of substantial performance inapposite.  *Bath & Beyond,* 1996 U.S. Dist. Lexis 21078, at *7.  To the extent the trustee believes that the enforcement of this agreement equates to a forfeiture, the Court finds that Arvest fulfilled its duty to notify the debtors immediately upon their breach and to advise them that Arvest intended to pursue its remedies under the settlement agreement.  *Grayson-McLeod Lumber Co. v. Slack-Kress Tie & Stave*, 143 S.W. 581, 583 (Ark. 1912).

consent judgments satisfied) if the debtors did not first timely and fully perform.

"The flexible concept of substantial compliance 'stands in sharp contrast to the requirement of strict compliance that protects a party that has taken the precaution of making its duty expressly conditional.'" *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 419 (N.Y. 1995) (citation omitted).  Arvest's performance under the agreement was expressly conditioned upon the debtors first timely and fully performing their obligations.  Arvest's obligations under the settlement agreement (in the event that the debtors timely and fully performed) and Arvest's remedies under the settlement agreement (in the event that the debtors did *not* timely and fully perform) are two sides of the same coin.  If the debtors fully and timely performed, Arvest became obligated to reciprocate performance by releasing the Fawn Trail deed, deeming the deficiencies satisfied, and filing satisfactions of the consent judgments.  If the debtors failed to fully and timely perform, Arvest became entitled to its remedies under the settlement agreement consisting of *not* releasing the Fawn Trail deed, *not* deeming the deficiencies satisfied, and *not* filing satisfactions of the consent judgments.[27]

The trustee argues that Arvest received what it bargained for in all material respects once the debtors made the cash payments and the Court compelled the debtors to deliver the deeds that effectuated the transfers of the subject properties to Arvest.  However, "the fact that [the breaching party] has gone to a great deal of trouble *otherwise* to comply with the agreement does not . . . make [the breach of a different provision] of the agreement a minor one." *Bath & Beyond*, 1996 U.S. Dist. Lexis 21078, at *7 (emphasis added).  The doctrine of substantial performance "is not properly used to redefine what constitutes a breach" of a settlement agreement.  *Id.*  The Court finds that Arvest took the precaution of making its performance expressly conditional upon the debtors' *full and*

---

[27]  Even in the absence of the debtors' full and timely performance, Arvest remains obligated under the settlement agreement (pursuant to paragraph 5 of the August 4, 2011 Settlement Agreement) to give the debtors credit for the amounts paid and the property transferred as a result of the agreement.

*timely* performance, and, as a result, the doctrine of substantial performance does not apply to the Settlement Agreement.  As discussed below in section III., the debtors cannot escape the agreed-upon contractual remedies for their default by invoking the doctrine of substantial performance.[28]  *Riesett,* 293 F.3d at 173.

## III.   Arvest's entitlement to remedies under the Settlement Agreement

Both the trustee and Arvest seek the enforcement of the settlement agreement.  The parties merely disagree regarding what enforcement of the settlement agreement means in this case.  The trustee argues, in effect, that enforcement of the settlement agreement necessitates the Court's selective abrogation of certain terms that seem unreasonable or unfair to the debtors in retrospect because the debtors failed to comply with them.  Arvest argues that the Court must enforce the settlement agreement as it is written, including the remedies provided in the agreement that were ostensibly included in contemplation of the precise situation that is now before the Court–the debtors' failure to fully and timely perform all terms of the agreement.

Although courts have the equitable power to set aside a contractual provision when its enforcement would be unconscionable due to circumstances such as the parties' disparate sophistication, the existence of fraud, or the execution of the agreement under duress, "[t]he unconscionability doctrine has no application to contracts, such as the Settlement

---

[28]   The debtors could have escaped the execution of Arvest's contractually-dictated remedies earlier in this litigation but chose not to do so.  After the debtors breached their obligation to timely and fully perform, Arvest twice attempted to salvage its divorce from Griffin by offering to forgive the debtors' breaches in exchange for additional consideration.  On November 18, 2011, Arvest offered to deem the debtors in full and timely compliance with the agreement (despite their breaches) in exchange for closing by November 22, 2011, a phase I environmental affidavit, and $15,000.00 in settlement of the attorneys fees awarded to Arvest in relation to its Second Motions for Relief.  On January 16, 2012, Arvest, again, offered to forgive the debtors' breaches in exchange for full payment of the cash components due under the agreement and $24,000.00 in settlement of the attorneys fees related to Arvest's Second Motions for Relief.  The debtors declined both offers.

Agreement in this case, which were entered into by sophisticated parties who bargained at arms' length and were represented by counsel throughout the negotiations." *Riesett*, 293 F.3d at 173. Courts are not required to "'revise a contract and give a litigant a better bargain than he himself made.'" *Elda Arnhold & Byzantio, LLC v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 708 (7th Cir. 2002) (quoting *Maywood Proviso St. Bank v. York St. Bank & Trust Co.*, 625 N.E.2d 83 (1st Dist. Ill. 1993)). Likewise, a court "cannot make a contract for the parties, but can only construe and enforce the contract that they have made." *Hyundai Motor Fin. Co. v. McKay* (*In re McKay*), 443 BR. 511, 519 (Bank. E.D. Ark. 2010) (citing *Alltel Corp. v. Sumner*, 203 S.W.3d 77 (Ark. 2005)). By carrying out its duty to enforce the contract that the parties have made, "courts avoid substituting their judgment for those of sophisticated parties and concomitantly extinguishing the parties' legitimate expectations in freedom of contract." *Arnhold*, 284 F.3d at 709. Therefore, "[c]ourts will enforce contracts of settlement if they are not in contravention of law." *In re McKay*, 443 BR. at 519 (citing *McCoy Farms, Inc. v. J & M McKee*, 563 S.W.2d 409 (1978)). By entering the Agreed Order Approving Compromise, the Court found on October 17, 2011, that the settlement reached between Arvest and the debtors did not contravene the law and the Court finds no reason to alter that finding today, some two and a half years later. It is the Court's duty, therefore, to enforce the terms of the settlement pursuant to the parties' agreement.

To facilitate a quick and permanent finale to the parties' enervating history, the parties agreed that Arvest would forgive approximately three million dollars of debt on the condition that the debtors first "timely and fully" performed their obligations under the settlement agreement by: executing consent judgments in favor of Arvest in the state-court foreclosure actions (to be filed by Arvest only if the debtors failed to timely and fully perform their other obligations under the agreement); transferring the subject properties to Arvest free and clear of any liens or encumbrances; making a cash payment to Arvest within 30 days of the Court's approval of the agreement; and making a second cash payment to Arvest 90 days after the Court's approval of the agreement *if* Griffin could come up with the funds for the second payment. The parties agreed that in the

49

event Griffin had timely and fully performed all terms of the agreement other than the final cash payment, Arvest would retain the deed to the Fawn Trail property in lieu of the final payment without declaring a default.  Designed to effectuate one of Arvest's primary objectives under the agreement–to be free of Griffin in short order and for good–the parties agreed that if the debtors did not timely and fully perform, Arvest would be entitled to retain the Fawn Trail property, its deficiency judgments, and the consent judgments.  Arvest did not impose this deal upon the debtors unilaterally.  The debtors voluntarily agreed to the conditions and terms contained in the agreement.

Apparently, the debtors later regretted having granted Arvest its remedies under the settlement, but neither the debtors nor the trustee have alleged that Arvest's contractual remedies are invalid (only that the Court should not enforce them).  In fact, on November 9, 2011, Davidson specifically acknowledged the validity of Arvest's contractual remedies in an email to Welch wherein Davidson unsuccessfully attempted to obtain Arvest's agreement to limit the application of the remedies.  When that approach failed, the debtors continued to tempt fate by simply withholding the documents necessary for Arvest to enforce its contractual remedies.  The debtors traveled further down their risk-laden path when they moved the Court to intervene on the debtors' behalf to require Arvest to accept different consideration that what it bargained for in the form of quitclaim (rather than warranty) deeds, "only the money paid," and "not the Consent Judgments and deed to the Fawn Trail property."

The Court made clear to the debtors in its December 7, 2011 ruling on Arvest's motion to compel that it would not endorse the debtors' attempt to renegotiate the agreement with Arvest.  The Court ordered the debtors to comply with the settlement agreement for the fundamental reason that "that was the agreement."  The Court declined to rewrite the settlement agreement for the parties on December 7, 2011, and declines to do so now.  The debtors doggedly attempted a number of times to renegotiate the settlement agreement with Arvest after it was executed.  Arvest, understandably, declined to accept the proposed "alternative" terms that were more favorable to the debtors and less

50

favorable to Arvest. "If [the debtors] had truly focused all of [their] legal resources on completing the deal, instead of trying to rewrite it, then perhaps we would not be here today." *Arnhold*, 284 F.3d at 708. The Court finds no reason to "'relieve [the debtors] of the consequences of their bargain. If they are dissatisfied with the consequences of their agreement, the time to say so [was] at the bargaining table.'" *Oppenheimer & Co.,* 660 N.E.2d at 421 (quoting *Maxton Bldrs. v. Lo Galbo*, 502 N.E.2d 184 (N.Y. 1986)).

**Conclusion**

For the above-stated reasons, the Court grants the trustee's *Motion to Enforce Settlement Agreement and Compel Arvest Bank's Delivery of Documents* but declines the relief requested. Instead, the Court specifically authorizes Arvest to pursue its contractual remedies pursuant to the August 4, 2011 Settlement Agreement, the Motion to Approve Compromise, and the Agreed Order Approving Compromise entered on October 17, 2011. Pursuant to Ark. Code. Ann. § 16-22-308, the Court awards Arvest its attorneys fees and costs in this matter from the date of the debtors' breach of the settlement agreement on November 16, 2011, to the date of the entry of this order. Arvest shall file with the Court and serve upon the trustee and other parties in interest its application for attorneys fees and costs within 21 days of the entry of this order. If so inclined, the trustee and other parties in interest may file objections to Arvest's application within 21 days of Arvest's filing of its application. Each objection must state with specificity its legal and factual basis. If objections are timely filed, the Court will set a hearing by subsequent notice.

*Ben Barry*

IT IS SO ORDERED.

cc:   Thomas S. Streetman, attorney for trustee
      Richard L. Cox, chapter 11 trustee
      Jackie L. Hill, Jr., counsel for Arvest
      Ruston C. Welch, counsel for Arvest
      Craig Campbell, local counsel for Arvest
      Derrick M. Davidson, attorney for Robert and Julia Griffin
      Patti S. Stanley, United States Trustee

Ben Barry
United States Bankruptcy Judge
Dated:  04/28/2014

51